(Nos. 64811, 64825 cons.—

KATHLEEN GREER *et al.*, Appellees, v. THE ILLI-NOIS HOUSING DEVELOPMENT AUTHORITY *et al.*, Appellants.

*Opinion filed May 18, 1988.*

464

466

Richard T. Franch and Michael Palmer, of Chicago (Jenner & Block, of counsel), for appellant Illinois Housing Development Authority.

James C. Murray, Jr., Francis X. Grossi, Jr., Patrick J. Lamb, Kirk T. Hartley and Rachel F. Best, of Chicago (Katten, Muchin & Zavis, of counsel), for appellants Elzie Higginbottom *et al.*

Michael L. Shakman, Geraldine Soat Brown, and Barry A. Miller, of Miller, Shakman, Nathan & Hamilton, and Mary Pennington Anderson, all of Chicago, for appellees.

JUSTICE CLARK delivered the opinion of the court:

This case raises a number of issues stemming from a suit by the appellees, several people who own property near a proposed "rehabilitation development" project in Chicago. Apartments in the project are only made available to "very low-income" tenants. One of the appellants, the Illinois Housing Development Authority (IHDA), approved assisted mortgage financing for the project. The appellees claim that this approval violates an alleged duty on the part of IHDA to avoid undue economic homogeneity in the projects it finances. In a separate action against the other appellants, the owners and developers of the project, the appellees claim that certain structural features of the project violate zoning ordinances, building codes, and rehabilitation codes of the City of Chicago.

The appellees are Kathleen Greer, Petra Harris, Dr. Carol Hurley, George McClelland, Caroline J. Magsaysay, Gonzalo P. Magsaysay, Frank L. Winter, and Aureen L. Winter. The appellants are the Illinois Housing Development Authority, American National Bank & Trust Company of Chicago, as trustee u/t/a dated 3/15/83 known as

trust No. 57324, Kenwood Apartments, an unincorporated partnership or association, Elzie Higginbottom, and Alfred Davis.

With respect to the appellees' claim against appellant IHDA, the trial court entered judgment on the pleadings in favor of IHDA. The trial court also entered judgment on the pleadings in favor of the other appellants with respect to the alleged zoning violation. Following an evidentiary hearing, the trial court entered judgment for the other appellants on the building code and rehabilitation code claims as well.

The appellate court reversed in part, affirmed in part, and remanded for further proceedings. The appellate court found that the appellees' complaint stated a claim against appellant IHDA for failure to refrain from promoting economic homogeneity in the projects it finances. It therefore reversed the judgment on the pleadings in favor of appellant IHDA and remanded for further proceedings on the economic homogeneity claim. It affirmed the judgment on the pleadings in favor of the other appellants on the zoning ordinance claim, but reversed the trial court's judgment in favor of the other appellants on the building code and rehabilitation code claims. (150 Ill. App. 3d 357.) We granted appellants' petition for leave to appeal. (107 Ill. 2d R. 307 (a).) The appellees have not cross-appealed to contest the appellate court's finding on the zoning ordinance claim.

Because of the complexity of the facts and issues involved in this case, we have divided this opinion into appropriate headings and discuss the facts pertaining to each issue under each heading.

## THE CLAIM AGAINST IHDA

### FACTS

Since the claim of the appellees against IHDA de-

pends in great part upon the interpretation of the Illinois Housing Development Act (Ill. Rev. Stat. 1985, ch. 67½, par. 301 *et seq.*) (the Act) and pertinent Federal legislation, we review the history and purpose of both, along with the facts alleged in the pleadings below. Like the appellate court, we also consider various documents—the developers' proposal as well as various letters and memoranda of HUD, other State agencies, and IHDA—which were exhibits incorporated by reference into IHDA's answer to the appellees' complaint. Since neither party disputes their authenticity, we accept them as authentic for the purpose of analysis upon review.

The Illinois Housing Development Act was enacted in 1967. (See Ill. Rev. Stat. 1985, ch. 67½, par. 301 (eff. July 24, 1967).) Its legislative history reveals that its passage as enacted was heavily influenced by the legislature's dissatisfaction with existing public efforts to house the poor.

There was a particular source of this dissatisfaction. The source was the perception that then current public housing programs tended to segregate poor people in large, ghetto-like high-rises, which inevitably became focal points for crime, delinquency, illegitimacy, and disease.

This perception is clearly reflected, time and again, in the recommendations of the Legislative Commission on Low Income Housing (the Commission), which was created by Illinois House Bill No. 2035, approved August 17, 1965. In April 1967, the Commission presented its report to the Governor, and it was this report which led directly to the creation of IHDA. (See Legislative Commission on Low Income Housing, *For Better Housing in Illinois* (1967) (*For Better Housing*).) The Commission's report provides helpful background material for the evaluation of the Act.

The Commission noted that "high density, high-rise public housing, which has provided adequate shelter, has also bred increasing social and environmental problems." (*For Better Housing* at 5.) A particular drawback of such housing was its tendency to "isolate *** inhabitants from the rest of the community, exacerbate existing social problems through excessive concentration of multiproblem families, and stigmatize those living there in easily identifiable, separate quarters." *For Better Housing* at 39.

The Commission traced the origins of high-density, high-rise public housing to the 1930s, when public housing was conceived of as "transient accommodation, designed to provide decent housing for families who, for reasons beyond their immediate control, were temporarily unable to afford private housing." (*For Better Housing* at 37, citing Final Report of the Massachusetts Special Commission of Low-Income Housing (1965) at 15.) The poverty suffered by these families was thought to be related to the ephemeral hardships of depression and war. After a short period in public housing, they were expected to exceed the maximum income limits for continued occupancy. They would then move "up and out" to decent, nonsubsidized housing in the private sector. As they left, the housing they vacated would become available to other low-income families, and the cycle would begin again. *For Better Housing* at 37, citing Final Report of the Massachusetts Special Commission of Low-Income Housing (1965) at 15.

In fact, however, the rapid movement "up and out" failed to materialize. There was an increasing awareness that the causes of poverty were systemic and endemic; that among the causes, structural unemployment and racial segregation played a strong role; that the turnover of public housing tenants was very low; and that public housing tenants who did move often returned to the

very slums they had left behind. *For Better Housing* at 37-39.

To solve these problems, the Commission recommended, and the Act established, several new kinds of housing programs. The various programs recommended by the Commission were all designed to remove the stigmatizing effects of economically segregated housing projects by replacing them with developments where poor people could live with others in relative anonymity. For example, the Commission recommended the "purchase of all or parts of new, newly rehabilitated or existing privately built developments." (*For Better Housing* at 39.) Individual low-income units would be purchased "in blocks or scattered throughout the development or structure." The Commission noted that "the effect of this type of housing through acquisition will be housing of improved design, anonymity (*i.e.*, recipients of public assistance will not be instantly identifiable by their housing), the healthy mixture of diverse social and economic groups, and the flexible provision of financial aid. With regard to the last point, if a family is no longer in need of subsidy, it can remain in its home by assuming the full financial obligation." (*For Better Housing* at 40.) Similarly, the Commission recommended "leasing private apartments in various sections of a community." Under this program, "[n]ot more than 25% of tenants in any one building can be participants in the program. Subsidized tenants pay their rent as other tenants do, only in a lesser amount, and the difference is made up by the housing authority through a direct payment to the landlord." *For Better Housing* at 40.

The Commission's recommendations with respect to the planning and construction of public housing shared a similar thrust. The Commission noted that the State's role with respect to the planning and construction of public housing was "meager," and that "even in the area

in which State funds and State energies have been more directly involved—moderate income housing—the result in terms of units constructed is most disappointing." (*For Better Housing* at 47.) The Commission proposed that the State program be revamped in two respects: (1) by replacing State grants with direct, low interest, long-term State housing loans to private developers, financed through the sale of tax-exempt State bonds, and (2) by expanding the program to serve low-income families in addition to moderate-income families. (*For Better Housing* at 47-49.) Therefore the Commission recommended "an expanded State Housing Board be given the power to make federally insured mortgage loans to finance the building and rehabilitation of housing on a cooperative or condominium basis or at low and moderate rentals for families of low and moderate income." *For Better Housing* at 48.

The Commission justified the inclusion of low-income families in the program by noting that "there is a great scarcity of decent housing for the poor in this State, as our Report amply demonstrates." (*For Better Housing* at 48.) It noted that the dissatisfaction of low-income families "with themselves and their position in a society which provides others with a high standard of living results in a sense of not belonging. Joining the life style of middle income groups is *** the aim of the isolated." (*For Better Housing* at 50.) To ease their dissatisfaction, "a means must be found to give the lower income family a sense of belonging that can arise only from a sense of permanency." (*For Better Housing* at 51.) Therefore, "it is possible and desirable to make a substantial portion (25% or more) of the units in each building developed under this program available at reduced costs to low income families. *By doing this, these families will be allowed to live in decent apartments, without identification, in close proximity to families of differing economic and social*

*levels,* and will not be required to move when their incomes increase; they will be able to continue living in the same apartment at an increased cost." (Emphasis added.) *For Better Housing* at 49.

The Commission proposed two methods of achieving the goal of integrating moderate- and low-income families in the same developments: (1) direct State subsidies to provide the difference between the rent or mortgage payments established by the Federal insuring agency and the amount the low-income family could afford, and (2) "rent skewing," a method by which the rents in the majority of unsubsidized moderate-income apartments would be raised slightly in order to allow larger reductions in the minority of subsidized low-income apartments, the total rent roll remaining constant. *For Better Housing* at 49-50.

The Commission's observations and recommendations are reflected in the provisions of the Act. The legislative finding and declaration states:

"It is hereby found and declared that as a result of public actions involving highways, public facilities and urban renewal projects and as a result of the spread of slum conditions and blight to formerly sound neighborhoods and as a result of the high costs of heating dwelling units, and as a result of the shortage of and high cost of financing for housing, *there exists within Illinois a serious shortage, of decent, safe, and sanitary housing available at low and moderate rentals to persons and families of low and moderate income.* This shortage is inimical to the safety, health, morals, and welfare of the residents of this State and the sound growth of its communities. Private enterprise and investment, without the assistance contemplated in this Act, is not disposed to nor can it economically achieve the needed construction of decent, safe and sanitary housing *at rentals which persons and families of low and moderate income can afford,* nor is it disposed nor can it so achieve the urgently needed rehabilitation of existing housing or the provision

of existing housing to those persons and families at those rentals. *It is, therefore, imperative that the cost of mortgage financing \*\*\* be made lower in order to reduce rental levels for low and moderate income persons and families \*\*\** and that private enterprise be encouraged to acquire, build and rehabilitate housing which will help prevent the recurrence of slum conditions and assist in their permanent elimination *by housing persons of varied economic means in the same structures and neighborhoods.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 67½, par. 303.

To achieve these goals, the Act created the Illinois Housing Development Authority as a body politic and corporate. (Ill. Rev. Stat. 1985, ch. 67½, par. 304.) Under the Act, IHDA is given many powers, among these the power to "make mortgage or other loans to nonprofit corporations and limited-profit entities for the \*\*\* rehabilitation of such developments as in the judgment of the Authority have promise of supplying, on a rental, cooperative, condominium or home ownership basis, well planned, well designed energy-efficient housing for low or moderate income persons or families at low or moderate rentals in locations where there is a need for such housing." (Ill. Rev. Stat. 1985, ch. 67½, par. 307.2.) To raise the money for such loans, IHDA is empowered to borrow money and issue its own negotiable bonds and notes (Ill. Rev. Stat. 1985, ch. 67½, par. 307.14), to accept gifts, grants, and loans from private, State, and Federal agencies (Ill. Rev. Stat. 1985, ch. 67½, par. 307.20), and enter into agreements or transactions with local, State, and Federal agencies (Ill. Rev. Stat. 1985, ch. 67½, par. 307.11).

Whatever the source of IHDA's funds, the Act places several restrictions upon their use. Among these restrictions is the requirement of a plan for selecting the tenants of a development. (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) Before agreeing to lend money to a developer,

IHDA "shall approve a tenant selection plan" submitted by the developer. IHDA "shall formulate regulations from time to time setting forth the criteria for tenant selection plans." The criteria for the selection plans "shall include income limits, which may vary with the size and circumstances of the family unit of tenants. The income limits shall be sufficiently flexible to avoid undue economic homogeneity among the tenants of a development." Section 10 also provides that IHDA "may formulate regulations for the alteration of occupancies of tenants who exceed established income limits." Finally, the tenant-selection plan "shall specify how many units in the development shall be held available for rentals to persons of low or moderate income, as defined in this Act." Ill. Rev. Stat. 1985, ch. 67½, par. 310.

The Act defines "[p]ersons and families of low and moderate income" and "persons of low or moderate income" as "families and persons who cannot afford to pay the amounts at which private enterprise, without assisted mortgage financing, is providing a substantial supply of decent, safe, and sanitary housing." (Ill. Rev. Stat. 1985, ch. 67½, par. 302(g).) The Act also provides that "[t]he income limits for the admission of such families and persons to developments shall be those established pursuant to the rules applicable to the assisted mortgage financing program under which such developments are financed." Ill. Rev. Stat. 1985, ch. 67½, par. 302(g).

The Act goes on to provide:

> "In determining the number of units which shall be so held available for [rentals to persons of low or moderate income] and in determining the rental charges which may be established for those units, the Authority shall estimate the financial benefit of the mortgage loan to the owner of the development, as compared to the costs of a mortgage loan made in the private unassisted market. The number of such units and the rentals for them shall

be determined in such a way that, in the sole judgment of the Authority, a major portion of that estimated benefit is used to reduce rentals for those units to rentals lower than that which would otherwise have been charged for those units, so long as the number of dwelling units reserved for them in each development shall not be less than the number required by applicable federal and State law." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.)

One of the sources of IHDA's funding is the "section 8" housing assistance funds which IHDA receives from the United States Department of Housing and Urban Development (HUD). See United States Housing Act of 1937, 42 U.S.C. §1401 *et seq.* (the Housing Act).

Under the section 8 program, HUD is authorized to make housing assistance payments "[f]or the purpose of aiding lower income families in obtaining a decent place to live and of promoting economically mixed housing." (42 U.S.C. §1437f(a) (1985).) In order to distribute the funds, the Secretary of HUD is authorized to enter into "annual contributions contracts" with other public housing agencies, such as IHDA. Public agencies may, in turn, contract with the owners or developers of existing or proposed housing. (42 U.S.C. §1437f(b)(1) (1985).) Eligible tenants pay no more than 30% of their income toward rent; through the public agency, HUD compensates the developer for the remaining balance needed to generate rentals which HUD has determined to be the "market rate" for the area. (See 42 U.S.C. §§1437a, 1437c (1985); 24 C.F.R. §813.107 (1985).) In the case of projects which contain more than "fifty units and designed for use primarily by nonelderly and nonhandicapped persons *** the Secretary may give preference to applications for assistance involving not more than 20 per centum of the dwelling units in a project." (42 U.S.C. §1437f(c)(5) (1985).) Aside from this section, the Housing Act does not mandate that there be any particu-

lar proportion of subsidized units in any project which receives assistance.

While the Housing Act thus contemplates assistance to projects which contain both nonsubsidized and subsidized dwelling units, the actual section 8 subsidies are to be used only for units housing low-income families or very-low-income families, as those terms are defined in the Housing Act. (See 42 U.S.C. §§1437a(b)(2), 1437f(c)(4), 1437n (1985); see also 24 C.F.R. §§813.101, 813.102, 813.105 (1985).) Originally the Code of Federal Regulations required that the proportion of section 8 funds be used for very-low-income assisted housing, as opposed to low-income assisted housing, could not be less than 30% of HUD's total assistance portfolio (see 42 U.S.C. §1437f(c)(7) (1985); 24 C.F.R. §883.704(c) (1985).) In 1981, however, Congress amended the section 8 program to increase the required proportion of very-low-income assisted housing from 30% to 95%.

The pleadings of the parties contain no direct information as to how IHDA treated applications for assistance prior to 1981. However, a letter from IHDA to HUD does shed some light on this subject. In a letter dated February 18, 1983, to HUD, IHDA commented on HUD's (then proposed) regulations implementing the 1981 amendments. IHDA's letter objected to several of the proposed amendments. As background to its specific objections, IHDA noted that "one of the cornerstones of [IHDA's] development activity has been promotion of the concept of mixed-income housing. Approximately one-quarter of all units financed by the Authority do not receive any form of subsidy from the Federal Government. Many of our developments have only 20 to 30% of all units subsidized. In addition, the Authority has promoted economic integration within the subsidized units by attempting to achieve a balance between low-income and very low-income tenants ***. Given the Authority's em-

phasis on mixed income housing, the Housing and Community Development Amendments of 1981 and the proposed regulations will have a profound effect on the Authority's program activities."

Another source of information on IHDA's treatment of applications for assistance, both before and after the 1981 amendments to the Housing Act, is contained in an IHDA report which detailed the status of its projects as of January 31, 1985. Without going into the evidence of this report in detail, it is sufficient to say that IHDA has funded some projects entirely composed of section 8 tenants, both before and after 1981, that some, but not all, of these projects are relatively small, and that some, but not all of them, are restricted to the elderly.

We thus arrive at the particular developments involved here. The two developments are located in the Kenwood neighborhood of Chicago. The parties agree that Kenwood is a racially and economically integrated community composed of persons of a variety of racial and economic backgrounds. There is already some subsidized housing in the area.

In November of 1983, the appellant developers filed a request for IHDA funding. They proposed the construction of 48 units of housing in two abandoned, gutted-out buildings. Twenty-seven units were to be, and now are, located at 4710 South Woodlawn Avenue, with the remainder at 4716-28 South Ellis Avenue. The two developments are on the border between the Kenwood neighborhood and a more "ghetto-like" area mainly populated by poor, black people.

The developers' request for funding included a tenant-selection plan which specified that all the units would be available for rental only to section 8 "very low income" families.

IHDA submitted the application to HUD for its review and approval. On June 19, 1984, HUD recom-

mended approval of the project. A memorandum explaining its approval determined: (1) that there was a need for the units, (2) that the development was consistent with the *Gautreaux* consent decree (see *Gautreaux v. Pierce* (7th Cir. 1982), 690 F.2d 616 (calling for scattered-site/subsidized housing)) and the City of Chicago's housing assistance program, (3) that the proposed market-rate rents were compatible with the designated fair-market rents for the area, and (4) that the proposed development would not cause an undue concentration of assisted housing in the area.

Following HUD's approval, IHDA sent notices about the development to various governmental bodies, agencies, and representatives. None of these persons or entities objected to the development. The State representative for the legislative district in which the development is located indicated his approval in a letter dated July 27, 1984.

On August 22, 1984, the Northeastern Planning Commission (NIPC) recommended support of the development and a waiver of the 20% section 8 guideline because the "[s]ite is small scale/scattered site proposed (49 units or less)" and the "[p]roposal will replace substandard housing units in the area." The Commission's report enclosed letters from the department of planning and the department of housing of the office of the mayor of the City of Chicago, stating that the development had been reviewed and that these departments had no objection to it. Other public officials also suggested approval of the project.

In November 1984, IHDA again sent notices to the appropriate city, county, and State officials, stating that IHDA had issued a "feasibility letter" for the development. On November 15, IHDA formally approved the developers' proposed tenant-selection plan, including the provision that the units would only be made available for

rental to section 8 "very low income" families. Shortly thereafter, IHDA's board of directors formally approved the loan.

The record contains three documents which memorialize IHDA's investigation of the development and of the character of the surrounding neighborhood. In the first, an undated "Development Analysis," the "Site/Market Characteristics" were described as follows: "The surrounding neighborhood appears to be stable. The lots adjacent to the Woodlawn building of the south and east are vacant, but the rest of the area is residential and well-maintained. The Ellis Street property is adjacent to Lake Village Apartments. The area is residential. Public transportation, shopping, and services are available at 47th and Cottage Grove." The second, an internal memorandum dated December 21, 1984, stated that 31% of the subsidized housing units in the Kenwood neighborhood were "Section 8 or public housing, while in Hyde Park this figure jumps to 62%." The memorandum also stated that census tracts 3904 and 3905, in which the development is located, had only 11 and 23 units of section 8 housing, respectively. The memorandum concluded that "the 48 units proposed for Kenwood Apartments would have a negligible impact upon the community."

In the third memorandum, dated January 18, 1985, an employee of IHDA reported on the results of her investigation to determine whether the development should include market-rate units as well as subsidized units. After noting that "a full site-market was not completed because the proposal is under the Section 8 moderate Rehabilitation Program and FHA insured," the memorandum goes on to state that she had "surveyed" the "comparables" in the area and determined that the "average weighted" rent for a one-bedroom apartment in the area was $520, a figure fairly close to the developer's proposed market-rate rent of $535. However, the

comparables used were "south of 49th Street and relatively close to the lake." After an inspection of the site, the memorandum notes that the first development would be located on a block where "the condition of the housing stock is poor. South on Ellis on the next block, however, the housing stock drastically improves. Huge mansion-like homes begin to appear, most reasonably kept up." As for the second site, it is also located on a "rundown block." 1980 census data indicated that the median monthly rent for all apartments in Kenwood was $203.

This memorandum concluded that "the housing stock on the 4700 blocks of both Ellis and Woodlawn is simply too run-down to attract market rate tenants. The sites are also too far from the University of Chicago to attract the needed student market." The memorandum suggested that "if elements in the community insist both IHDA and HUD have misjudged market demand," that half the units in the building be offered at market rents for a 60-day trial period. There is no evidence in the record that this suggestion was ever followed up.

The Federal Housing Administration (FHA) also reviewed the developers' proposal and agreed to provide a mortgage repayment guarantee. While both sides seem to assume that the FHA performed a market study prior to IHDA's approval of the loan, neither the precise date nor the substance of the FHA's study and approval appear in the record. IHDA's answer to the complaint states, however, that "IHDA admits that it conducts formal market studies before making a loan commitment on an uninsured mortgage loan; that it conducted a less formal, although wholly adequate market study with respect to the Proposed Development (as is IHDA's customary practice with all other FHA developments, where the FHA conducts a market analysis); and that the mortgage loan for the Proposed Development is insured by the FHA."

The appellees filed their complaint against IHDA on January 23, 1985. In an introductory section, the complaint alleged many of the facts recited above and also claimed that the proposed development would "substantially contribute to the already existing concentration of assisted housing" in the vicinity; would "discourage the racially and economically integrated character of the Kenwood neighborhood"; and would "severely impair and may totally prevent the development of market-rate, racially and economically integrated housing on the immediately adjacent parcels and throughout the Kenwood neighborhood." This section of the complaint also alleges that the proposed development would cause a decrease in the value of the appellees' homes. They claimed that IHDA failed "at any time to take into consideration [these] facts."

In count I of their complaint, the appellees argued, in essence, that IHDA's funding of the development violated IHDA's duty to promote economic heterogeneity. They specifically relied on IHDA's alleged statutory duty to avoid "undue economic homogeneity" both in IHDA-financed structures and in the areas where the structures are located. Specifically, the appellees alleged that restriction of the apartments to section 8 "very low income" families would violate IHDA's statutory obligations and would cause the appellees severe and irreparable injury. Count I requested a declaratory judgment and finding that IHDA not proceed with the funding.

In count IA of their complaint, the appellees alleged in substance that IHDA had not conducted an independent review in connection with the developers' proposal. More specifically, they alleged that IHDA failed to conduct a market study to determine whether the development complied with the "Act's standards, including those intended to generate economic diversity." They also alleged that IHDA had arbitrarily changed its policy

of funding mixed-income housing in order to be eligible for section 8 funds and had thereby violated its statutory responsibility under the Act. In connection with this claim, the appellees noted that section 8 does not preclude IHDA from using section 8 funds to support subsidized units in developments which combine subsidized and market-rate units. They also alleged that IHDA had failed to request a waiver of HUD's "very low income" requirements. The appellees concluded this section by alleging that IHDA had "abdicated and failed to exercise its independent Illinois statutory responsibilities or any discretion vested in it by the Act," and that IHDA's actions were "unlawful," "inconsistent with its statutory mandate," and "arbitrary and capricious."

Count IB of the complaint, based upon the pertinent allegations in counts I and IA, requested the issuance of a common law writ of *certiorari*. This portion of the complaint again alleged that IHDA had failed to give any consideration to the Act's statutory requirements for economic integration. It also alleged that IHDA's action was "contrary to the manifest weight of the evidence."

IHDA's verified answer to the appellees' complaint was comprised, in substance, of a denial that the funding of the development was not within the scope of IHDA's authority or that IHDA had abused its discretion. It also included many of the documents alluded to above, including the memoranda which it claimed were part of its "informal" market study. It also interposed six affirmative defenses: (1) that the appellees lacked standing; (2) that IHDA's decision was not subject to judicial review; (3) that the appellees did not have a private right of action; (4) that IHDA's actions were within its statutory authority; (5) that the appellees' complaint failed to state a cause of action against IHDA; and (6) that the appellees'

complaint was barred by *laches.* IHDA has raised some, but not all, of these defenses on appeal.

IHDA subsequently filed a motion for judgment on the pleadings. Following briefing and oral argument by the parties, the trial court granted IHDA's motion. The court's written order referred to the court's oral statements to the parties, which were appended as exhibits to the order. In these remarks, the trial court's stated reason for judgment in favor of IHDA was, in essence, that the appellees lacked standing. The remarks also, however, touched on all of the first four affirmative defenses raised by IHDA, including standing, nonreviewability, the lack of a private right of action, and proper exercise of IHDA's discretion. For the purposes of our analysis, we group IHDA's defenses and arguments into three broad categories: (1) lack of standing, (2) nonreviewability, and (3) failure to state a claim that IHDA'a actions were arbitrary and capricious.

## ANALYSIS

### Standing

IHDA maintains that the appellees lack standing to challenge its funding of the development and its approval of the tenant-selection plan. IHDA claims that the proper test for assessing standing to challenge the illegality of administrative action is that the party who asserts standing must demonstrate: (1) that the illegal action will cause the plaintiff to suffer injury in fact and (2) that the interest asserted by the plaintiff lies within the zone of interests arguably sought to be protected by the statute in question. (See *Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 155-56, 25 L. Ed. 2d 184, 189, 90 S. Ct. 827, 830-31.) IHDA argues that the appellees do not meet either prong of this bipartite test. The appellees counter

by claiming that they need only show injury in fact, the first prong of the *Data Processing* test, and that the second prong of the *Data Processing* test, the "zone of interest" requirement, is not a prerequisite for standing under Illinois law. In the alternative, they maintain that they meet both prongs of the *Data Processing* test. Since the question of whether Illinois should adopt the zone-of-interest requirement is a question of first impression in our court (but see *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 747-48), we take this opportunity to review the law of standing in some detail.

Together with allied doctrines like mootness, ripeness, and justiciability, the standing doctrine is one of the devices by which courts attempt to cull their dockets so as to preserve for consideration only those disputes which are truly adversarial and capable of resolution by judicial decision. There is universal agreement that one component of standing—injury in fact—genuinely narrows the class of potential plaintiffs to those whose grievances may be redressed by such decisions. As one commentator has put it: "Elementary justice requires that one who is hurt by illegal action should have a remedy. The central principle that grows out of [this] is very simple: *One who is adversely affected in fact by governmental action has standing to challenge its legality, and one who is not adversely affected in fact lacks standing.*" (Emphasis in original.) (4 K. Davis, Administrative Law Treatise §24:2, at 212. (2d ed. 1983).) The key question has been whether standing, particularly standing to challenge the legality of governmental action, requires not only injury in fact, but something else as well.

Prior to 1970, the Federal courts generally held that a plaintiff must show not only an injury but also some "legal interest"—founded either in common law or in a specific statutory or constitutional provision—which would entitle him to relief. (See, *e.g., Tennessee Power Co. v.*

*Tennessee Valley Authority* (1939), 306 U.S. 118, 83 L. Ed. 543, 59 S. Ct. 366.) In 1970, however, the United States Supreme Court abandoned the "legal interest" test, at least for actions brought under the Federal Administrative Procedure Act (APA). The Court stated that the legal-interest test confuses standing to sue with the merits of a suit. Interpreting that provision of the APA which grants standing to a person "aggrieved by agency action within the meaning of a relevant statute" (see 5 U.S.C. §702 (1982)), the Court held in two cases that standing could be shown if, in addition to injury, the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (*Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 153, 25 L. Ed. 2d 184, 188, 90 S. Ct. 827, 830; see also *Barlow v. Collins* (1970), 397 U.S. 159, 164, 25 L. Ed. 2d 192, 198, 90 S. Ct. 832, 836.) Justices Brennan and White, concurring in the result and dissenting, disagreed with the "zone of interests" test, stating that standing only requires a showing that the challenged action has caused the plaintiff injury in fact. In their opinion, "[b]y requiring a second, nonconstitutional step, the Court comes very close to perpetuating the discredited requirement that conditioned standing on a showing by the plaintiff that the challenged governmental action invaded one of his legally protected interests." (*Barlow*, 397 U.S. at 168, 25 L. Ed. 2d at 200, 90 S. Ct. at 838-39 (Brennan and White, JJ., concurring in the result and dissenting).) It was their view that the "zone of interests" test, like its predecessor, the "legal interests" test, confused standing to sue with such separate issues as reviewability and the merits of a particular claim. Only these latter issues, and not standing, they wrote, need be determined by consider-

ing the zone of interests sought to be protected by a particular statutory provision.

Since its adoption by the United States Supreme Court, the *Data Processing* "zone of interests" test has had a checkered career. As of 1982, one commentator counted only 6 Supreme Court references to the test aside from the references in *Data Processing* and *Barlow*, 27 Supreme Court cases in which the test was arguably relevant but was not mentioned, and no case in which the Supreme Court actually used the requirement to deny a plaintiff standing. (4 K. Davis, Administrative Law Treatise §24:17, at 277 (2d ed. 1983).) The test has been severely criticized by many commentators (see, *e.g.*, 4 K. Davis, Administrative Law Treatise §24:17 (2d ed. 1983); Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief*, 83 Yale L.J. 425 (1974); Roberts, *Fact Pleading, Notice Pleading, and Standing*, 65 Cornell L. Rev. 390 (1980); Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv. L. Rev. 645 (1973); Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 Cornell L. Rev. 663 (1977)) and has been rejected by a number of State courts (see *Associated California Loggers, Inc. v. Kinder* (1978), 79 Cal. App. 3d 34, 144 Cal. Rptr. 786; *Wimberly v. Ettenberg* (1977), 194 Colo. 163, 570 P.2d 535; *In re Surface Water Management Permit No. 50—01420—S* (Fla. App. 1987), 515 So. 2d 1288; *Life of the Land v. Land Use Comm'n* (1981), 63 Haw. 166, 623 P.2d 431; *Iowa Banker's Association v. Iowa Credit Union Department* (Iowa 1983), 335 N.W.2d 439; *Snyder's Drug Stores, Inc. v. Minnesota State Board of Pharmacy* (1974), 301 Minn. 28, 221 N.W.2d 162; *Crescent Park Tenants Association v. Realty Equities Corp.* (1971), 58 N.J. 98, 275 A.2d 433; *New Hampshire Banker's Association v. Nelson* (1973), 113 N.H. 127, 302 A.2d 810; *De Vargas Savings & Loan Association v.*

*Campbell* (1975), 87 N.M. 469, 535 P.2d 1320; *Rhode Island Ophthalmological Society v. Cannon* (1974), 13 R.I. 16, 317 A.2d 124). More recently, the Court, while acknowledging criticism of the test, has reaffirmed its validity and has indicated that it "is most usefully understood as a gloss on the meaning of section 702" of the Federal APA. *Clarke v. Securities Industry Association* (1987), 479 U.S. 388, 396 n.11, 400 n.16, 93 L. Ed. 2d 757, 767 n.11, 769 n.16, 107 S. Ct. 750, 756 n.11, 758 n.16.

Like the appellate court, we might assume *arguendo* that the zone-of-interests test is part of Illinois law and go on to conclude that the appellees, homeowners living near an IHDA development, have standing because they are among the intended beneficiaries of the Act's strictures against economic segregation. Since, however, we are convinced that the zone-of-interests test would unnecessarily confuse and complicate the law, we decline to adopt it.

We are not, of course, required to follow the Federal law on issues of justiciability and standing. (*Cusack v. Howlett* (1969), 44 Ill. 2d 233, 236 (rejecting Federal law as to ripeness); see also *Stanley Magic-Door, Inc. v. City of Chicago* (1979), 74 Ill. App. 3d 595, 597.) Moreover, to the extent that the State law of standing varies from Federal law, it tends to vary in the direction of greater liberality; State courts are generally more willing than Federal courts to recognize standing on the part of any plaintiff who shows that he is in fact aggrieved by an administrative decision. 2 F. Cooper, State Administrative Law 538 (1965); *Stanley Magic-Door, Inc.,* 74 Ill. App. 3d at 597.

If, however, we were convinced that the zone-of-interests test served some useful purpose we would not hesitate to adopt it. But the criticisms generally leveled against it persuade us that it is not a useful addition to the doctrine of standing. The zone-of-interests test has

generally proved to be a "feeble barrier to standing," which "seems more honored in the breach than as the rule." (2 C. Koch, Administrative Law & Practice §10.9, at 170 (1985).) Also, like the "legal interests" test before it, it tends to lead to confusion between standing and the merits of the suit. In the case before us, for example, application of the zone-of-interests principle would entail a examination of the goals, purposes, and objectives of the IHDA Act so as to determine whether the plaintiffs were among its intended beneficiaries. This same examination, or one very similar to it, is also needed to determine whether the plaintiffs have in fact stated a claim for relief. Nor is it always easy to determine whether a particular plaintiff's asserted interest falls within the zone "arguably sought to be protected" by a particular statutory provision. While it is often possible to identify the primary purpose of a statute, its secondary or subsidiary purposes are often not so obvious. The task of searching for them becomes more difficult when the legislative history is, as in this case, relatively sparse. Moreover, as the United States Supreme Court itself has noted, the test is not "self-explanatory." (*Clarke v. Securities Industry Association* (1987), 479 U.S. 388, 400, 93 L. Ed. 2d 757, 769, 107 S. Ct. 750, 762.) A test which is not self-explanatory and which does not in fact appreciably narrow the class of potential plaintiffs serves no useful purpose. We therefore decline appellant IHDA's invitation to adopt the test, at least in the context of a challenge which alleges a statutory violation by an administrative agency.

We thus adhere to the principle that standing in Illinois requires only some injury in fact to a legally cognizable interest. (*Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 245.) More precisely, the claimed injury, whether "actual or threatened" (*Warth v. Seldin* (1975), 422 U.S. 490, 500, 45 L. Ed. 2d 343, 355, 95 S. Ct. 2197,

2206), must be: (1) "distinct and palpable" (*Havens Realty Corp. v. Coleman* (1982), 455 U.S. 363, 375, 71 L. Ed. 2d 214, 227, 102 S. Ct. 1114, 1122); (2) "fairly traceable" to the defendant's actions (*Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977), 429 U.S. 252, 261, 50 L. Ed. 2d 450, 462, 97 S. Ct. 555, 561); and (3) substantially likely to be prevented or redressed by the grant of the requested relief (*Immigration and Naturalization Service v. Chadha* (1983), 462 U.S. 919, 936, 77 L. Ed. 2d 317, 335, 103 S. Ct. 2764, 2776; accord *Springfield Rare Coin Galleries, Inc. v. Johnson* (1986), 115 Ill. 2d 221, 228). In the context of an action for declaratory relief, there must be an actual controversy between adverse parties, with the party requesting the declaration possessing some personal claim, status, or right which is capable of being affected by the grant of such relief. (*Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 375-76.) The appellees first allege that IHDA's funding of the proposed development will cause injury to their interest in the economic value of their homes. They also allege that it will cause injury to their interest in living in a racially and economically integrated community. It must be determined whether these are legally cognizable interests.

There is no question that a diminution in the value of property is a legally cognizable interest. Economic injuries have long been recognized as sufficient to lay the basis for standing with or without a specific statutory provision for judicial review. (See, *e.g., Gladstone, Realtors v. Bellwood* (1979), 441 U.S. 91, 115, 60 L. Ed. 2d 66, 86, 99 S. Ct. 1601, 1615-16 (plaintiffs who owned homes in a suburban neighborhood had standing to challenge racial steering practices of the defendants which might cause an absolute or relative diminution in the value of their homes).) While at the time the complaint was brought this injury was "threatened" rather than

actual, the lack of immediate, ascertainable damages is not itself a barrier to the grant of declaratory and injunctive relief. Because of the appellees' proximity to the development, there is no question that they allege an injury which is "distinct and palpable," rather than a generalized grievance common to all members of the public. Nor is there any question that they allege that the diminution in the value of their homes would be "fairly traceable" to IHDA's approval of the development.

IHDA maintains nevertheless that the appellees' complaint did not pray for damages and did not sufficiently allege facts showing economic injury.

Neither of these arguments is persuasive. IHDA cites no authority for the proposition that a plaintiff seeking injunctive and declaratory relief to redress economic injury must also seek damages. Moreover, IHDA's underlying assumption that the appellees had the burden of alleging economic injury and, for that matter, standing, is incorrect. In Illinois, lack of standing is an affirmative defense. (*In re Custody of McCarthy* (1987), 157 Ill. App. 3d 377, 380.) The appellees had no burden to plead and prove standing; rather, it was IHDA's burden to plead and prove lack of standing.

Even in the Federal courts, where lack of article III (U.S. Const., art. III) standing is a bar to jurisdiction, it has been noted that controversies regarding standing are best resolved by motions for summary judgment rather than motions for judgment on the pleadings. (See *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)* (1973), 412 U.S. 669, 689, 37 L. Ed. 2d 254, 271, 93 S. Ct. 2405, 2416-17.) Like the defendants in *SCRAP*, IHDA remains free to utilize normal civil discovery devices, move for summary judgment, and demonstrate to the court that the allegations are sham and raise no genuine issue of fact. (412 U.S. at 689 n.15, 37 L. Ed. 2d at 271 n.15, 93 S. Ct. at 2417 n.15.) But noth-

ing which is alleged in the pleadings entitles IHDA to the judgment that the appellees lack standing.

Since we resolve the case upon this ground, we need not also decide whether standing may be based solely on injury to an interest in living in a viable, racially and economically integrated community. See, *e.g., Havens Realty Corp. v. Coleman* (1982), 455 U.S. 363, 375-78, 71 L. Ed. 2d 214, 227-29, 102 S. Ct. 1114, 1122-24.

## Reviewability

As to reviewability, appellant IHDA makes the following arguments: (1) that review of IHDA's discretionary exercise of its authority is precluded absent allegations of fraud, corruption, oppression, or gross injustice (see *People v. Roush* (1984), 101 Ill. 2d 355, 365); (2) that review is precluded by IHDA's status as a body politic and corporate rather than an administrative agency which performs quasi-adjudicatory functions; and (3) that review is precluded by language in the Act which commits decisions about the composition of IHDA projects to IHDA's sole discretion.

These contentions go to the heart of our ability to review IHDA's decisions or, indeed, the decisions of any administrative agency. Further complicating our task is the use by both parties of such terms as "discretion" and "abuse of discretion," which they do not define clearly or use consistently. To clarify the issues presented, we have surveyed administrative law as it has developed in other jurisdictions, and particularly in the Federal courts. Without endorsing the particular results reached in any of the cases cited below, we are guided by the following principles in reaching our decision.

Judicial review of an administrative action seeks to balance two competing interests. On the one hand, the interest in making administrative agencies conform to the law compels some judicial intervention. On the other

hand, too much intervention may interfere with the exercise of agency discretion and expertise. The balance struck between these two competing considerations is expressed by two concepts: "reviewability" and "standard of review." (See generally 5 K. Davis, Administrative Law Treatise §28:1 *et seq.*, §29:1 *et seq.* (2d ed. 1984); 2 C. Koch, Administrative Law & Practice §9.1 *et seq.* (1985).) While the line between the two concepts is not hard and fast, generally, "reviewability sets out the area of review and \*\*\* standards of review set out the level of the judicial involvement within that area." 2 C. Koch, Administrative Law & Practice §9.1 (1985).

The difficulty with such terms as "discretion" and "abuse of discretion" is that they are sometimes used in connection with reviewability and sometimes in connection with the standard of review. Discretion is sometimes used to mean "[u]nreviewable discretion encompass[ing] only those decisions which cannot by their nature be evaluated for correctness." (2 C. Koch, Administrative Law & Practice §9.35, at 148 (1985).) At other times it is used to mean discretion which can only be reviewed with great circumspection, using the lowest and least demanding standards of review.

Courts have generally recognized three levels of scrutiny, or standards of review, which can be used in the evaluation of an administrative action. In rare instances, an agency action may be subject to *de novo* review, in which little or no deference is given to agency judgment. (See, *e.g., Goodman v. United States* (5th Cir. 1975), 518 F.2d 505.) In other instances, an administrative action will be set aside if it is not supported by "substantial evidence" or if it runs counter to the "manifest weight of the evidence." (See, *e.g., Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391.) Lastly, agency action can be set aside if the agency exercises its discretion in an "arbitrary or capricious manner." (*Dorfman v. Gerber* (1963), 29 Ill. 2d

191, 196.) This last, and least demanding, standard of review is often equated with "abuse of discretion." For example, our court has stated that "[w]here an administrative order is against the manifest weight of the evidence or where the agency has acted arbitrarily or capriciously and thereby abused the discretion vested in it, the courts should not hesitate to intervene." (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 207.) Or, as another court has put it, the tests for arbitrariness and abuse of discretion "are far from *** discrete *** and [should be viewed as] cumulative." *National Resources Defense Council, Inc. v. SEC* (D.C. Cir. 1979), 606 F.2d 1031, 1049.

In their attack upon IHDA's decision, the appellees do not argue that the standard for review should be anything more stringent than review to determine whether IHDA's action was arbitrary and capricious or an abuse of discretion.

Since appellees are arguing for the least stringent standard of review, the threshold question is whether IHDA's decision to fund a development with a certain ratio of low-income to middle-income tenants is reviewable. The cases make clear that this is a question of statutory interpretation. We must seek to discover whether the legislature intended this type of IHDA decision to be reviewable.

As a preliminary matter, it is clear that most agency actions are presumed reviewable in the absence of some express statutory prohibition of review, or at least in the absence of language which commits the decision to unreviewable agency discretion. (See *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 141, 18 L. Ed. 2d 681, 687, 87 S. Ct. 1507, 1511.) Whether, and to what extent, a relevant statute precludes judicial review is to be determined by its express language, the structure of the statutory scheme, its objectives, its legislative history,

and the nature of the administrative action involved. (*Block v. Community Nutrition Institute* (1984), 467 U.S. 340, 345, 81 L. Ed. 2d 270, 275-76, 104 S. Ct. 2450, 2454.) Of particular importance is whether the statute contains standards, goals, or criteria by which a court may evaluate agency action. See *Citizens to Preserve Overton Park, Inc. v. Volpe* (1971), 401 U.S. 402, 410, 28 L. Ed. 2d 136, 150, 91 S. Ct. 814, 820 (unreviewable agency discretion confined to statutes " 'drawn in such broad terms that in a given case there is no law to apply' ").

Applying these factors, we hold that an IHDA decision to grant mortgage financing is reviewable and that the standard to be applied is that the decision must not be arbitrary or capricious.

IHDA first relies upon the express language of the Act. It is IHDA's contention that certain language in the Act commits the decision as to how many low-income units are to be included in a development to IDHA's sole, unreviewable, discretion. IHDA refers to section 10 of the Act, which states:

"In determining the number of units which shall be so held available for [rentals to persons of low or moderate income] and in determining the rental charges which may be established for those units, the Authority shall estimate the financial benefit of the mortgage loan to the owner of the development, as compared to the costs of a mortgage loan made in the private unassisted market. The number of such units and the rentals for them shall be determined in such a way that, *in the sole judgment of the Authority*, a major portion of that estimated benefit is used to reduce rentals for those units to rentals lower than that which would otherwise have been charged for those units, so long as the number of dwelling units reserved for them in each development shall not be less than the number required by applicable federal and State

law." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 67½, par. 310.)

We do not agree with IHDA's interpretation.

If this sentence meant that IHDA had absolute discretion to determine the number of market-rate tenants, then all of the language preceding this paragraph, particularly the requirement that IHDA shall provide for a tenant selection plan which does not create undue economic homogeneity among the tenants of a development, would have no meaning. We agree with the appellees that there is a narrower and more plausible interpretation of this language. We believe that it means, at most, that an IHDA decision to fix a certain number of market-rate units and/or rentals cannot be challenged on the basis that a different number of units or a different level of rentals would enable the developer to use a "major" portion of his mortgage benefit to reduce rentals for low-income tenants. We do not agree with the appellants that this language renders unreviewable all aspects of an IHDA decision to finance a particular development.

Moreover, much of the pertinent language of the statute, with the exception of the "sole judgment" clause quoted above, is mandatory. The statute provides that before making a loan commitment for the rehabilitation of a development, IHDA "shall" approve a tenant-selection plan. IHDA is given the authority to formulate regulations respecting the criteria for such plans. The criteria adopted by IHDA for such plans "*shall* include income limits" which "*shall* be sufficiently flexible to avoid undue economic homogeneity among the tenants of a development." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) The use of the word "shall" is usually taken to mean that the language is mandatory, and not directory. *People v. Youngbey* (1980), 82 Ill. 2d 556, 562.

It is also not the case that the statute itself provides no standards or criteria by which a reviewing court can

evaluate IHDA's decisions. On the contrary, the statute clearly provides that income limits are to be "flexible" enough so as to avoid "undue economic homogeneity among the tenants of a development." Further, the statute provides that IHDA may vary its income-limit criteria "with the size and circumstances of the family unit of tenants," and may even "formulate regulations from time to time for the alteration of occupancies of tenants who exceed established income limits." See Ill. Rev. Stat. 1985, ch. 67½, par. 310.

We think, particularly in the context of the goals set forth in the preamble, that this language is not so vague or general as to preclude judicial review. Income limits which are "flexible" are income limits which are not rigid or fixed. "Economic homogeneity" refers to the degree to which the tenants of a particular development share the same or similar income levels with each other. In fact, the only word for which we might have difficulty assigning a meaning is the word "undue."

We believe, nonetheless, that the statute's use of this word does not preclude judicial review. The legislature did not prescribe a magic number of market-rate units for each development. Its use of the word "undue" obviously grants to IHDA a large measure of discretion in the selection of income-limit criteria. It does not, however, give to IHDA so much discretion that the word "undue" has no meaning at all. It is clear that the word "undue," in this context, means homogeneity which is greater than that which the statute contemplates, given the statute's goal of encouraging private enterprise to "acquire, build, and rehabilitate housing which will help prevent the recurrence of slum conditions and assist in their permanent elimination by housing persons of *varied economic means* in the same structures and neighborhoods." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 67½, par. 303.

While the statute does not provide IHDA with a laundry list of factors to consider, we think it obvious, and the parties in fact seem to agree, that among the factors to be considered are the size of the development, the circumstances of the tenants, and the overall composition of the neighborhood.

IHDA's decision as to what constitutes "undue" homogeneity is obviously entitled to great deference. But this deference is best assured by subjecting that decision only to review to determine whether it is arbitrary or capricious, and not by insulating it from judicial review altogether.

We will detail below precisely what is meant by review to determine whether IHDA's decision is arbitrary and capricious. But before doing so, we consider certain other arguments raised by IHDA for the preclusion of judicial review.

IHDA first argues that its status as a body corporate and politic, rather than an agency which makes adjudicatory decisions, precludes judicial review. IHDA points out that our prior cases dealing with review of administrative agency actions have considered the results of adversarial administrative proceedings. In these cases, formal records have been created and findings of law and fact have been reached by officers of the administrative agency. IHDA argues, no doubt correctly, that such procedures greatly facilitate judicial review.

IHDA is correct in stating that none of our cases have involved nonadjudicatory administrative decisions. But IHDA cites no case, other than *People v. Roush* (1984), 101 Ill. 2d 355, which we consider in detail below, for the proposition that nonadjudicatory decisions are insulated from judicial review. In fact, our own research has failed to disclose any support for this principle. The closest we have been able to come to the proposition IHDA advances is the principle that where an agency

has not engaged in formal adjudication, and thus there is no "formal" record, review should be limited to testing administrative action for arbitrariness and capriciousness. (See *CF & I Steel Corp. v. Economic Development Administration* (10th Cir. 1980), 624 F.2d 136, 139; see also 2 C. Koch, Administrative Law & Practice §9.13, at 115 (1985).) Even assuming this principle is correct in all instances, we have in fact applied it here—since we hold that IHDA's finance decision will be tested only for arbitrariness and not as to whether it is supported by substantial evidence.

Lastly, IHDA argues that review is precluded by *People v. Roush* (1984), 101 Ill. 2d 355. To understand the basis of this contention it is necessary to review the facts of *Roush* in some detail.

In *Roush*, the central issue was whether a circuit court judge could properly hold the directors of State mental institutions in criminal contempt for failing to prevent the escape of mental patients who were under their control. The escaped mental patients had been found not guilty by reason of insanity (NGRI) and, under our statute, remained subject to the jurisdiction of the particular circuit judges who had committed them to the institutions. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(b).) The finding of contempt included a series of detailed orders about the management and administration of the institution which were intended to prevent any further escapes. Our court held that the criminal contempt citations were unwarranted because issued without a jury trial and for conduct which was negligent rather than wilful and the orders issued by the circuit court judge went beyond his proper jurisdiction over the particular NGRI patients he had committed. *Roush*, 101 Ill. 2d at 364.

In a subsidiary holding, we also concluded that the detailed orders were "not appropriate remedies based on

the facts presented in this case." (101 Ill. 2d at 365.) The reason for this holding can only be understood if quoted in full:

"In Illinois, it is well settled that when public officials are given discretionary administrative powers, courts of equity are reluctant to control or review the exercise of the power absent fraud, corruption, oppression, or gross injustice. [Citations.] Courts are particularly reluctant to get involved in the day-to-day administration of prisons [citation], because such decisions are best made by administrators vested with such authority, rather than judges. [Citation.] Every factual situation has its own contours, and there could be situations in the future where the director of a State mental institution could be held in contempt of court because of gross violations of his statutory duties, but this is not a situation we are confronted with at the present time. [Citations.]" 101 Ill. 2d at 365.

It is clear from the quoted language that *Roush* does not, as IHDA would have it, stand for the general proposition that courts cannot review the discretionary acts of administrative agencies. As the word "reluctant" indicates, *Roush* is a cautionary maxim rather than an absolute rule. Insofar as *Roush* suggests that courts will not, absent gross injustice, scrutinize agency decisions which are so committed to agency discretion as to be unreviewable for content, *Roush* is consistent with the principles we have outlined above. We have already said why the decision as to whether a tenant-selection plan creates undue homogeneity is subject to judicial scrutiny—although also entitled to great deference. Insofar as *Roush* cautions courts not to grant injunctive relief in cases where the injunction will require the court to engage in detailed, day-to-day supervision of an administrative agency or institution, it is also of very limited significance. The injunction requested here only involves a single, discrete decision as to the funding of a single development. In any case, we agree with the appellate court

that the question of appropriate relief need not be addressed unless and until the circuit court enters a judgment for the appellees.

## Sufficiency of the Claim

Lastly, IHDA argues that the appellees have failed to state a valid claim for relief. So far as we can understand, IHDA makes two arguments: (1) that the Act does not impose upon IHDA the affirmative duty of avoiding economic homogeneity in individual developments, and (2) that, even assuming such a duty, the appellees' complaint has failed sufficiently to allege that IHDA acted arbitrarily and capriciously with respect to the development at issue here.

On this first issue, we agree with the appellate court below that the Act does impose a duty upon IHDA to exercise its discretion in a manner that takes into account the degree to which a particular tenant-selection plan avoids undue economic homogeneity. We have already stated in detail the facts about the legislative history of the Act which make clear that one of its purposes, although not its only purpose, was to encourage economic desegregation. This purpose is clearly reflected in the Act's specific provisions. Under the Act, IHDA has a duty to "approve a tenant selection plan" before funding a development and to "formulate regulations *** setting forth the criteria for tenant selection plans." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) These criteria must include "income limits *** sufficiently flexible to avoid undue economic homogeneity among the tenants of a development." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) Since the tenant-selection plan must conform to IHDA criteria, and IHDA criteria must "avoid undue economic homogeneity among the tenants of a development," it follows that any tenant-selection plan approved by IHDA should avoid "undue economic homogeneity." Given the Act's

stated goal of "housing persons of varied economic means in the same structures and neighborhoods" (Ill. Rev. Stat. 1985, ch. 67½, par. 303), "undue economic homogeneity" refers not only to economic segregation in a particular development, but also economic segregation in the community where the development is located.

We also agree with the appellate court's determination that IHDA does not have an affirmative duty to assure any fixed level of economic integration, either in particular developments, or in the communities in which they are located. The Act only requires IHDA to consider the degree of economic segregation associated with a particular development and to take reasonable steps to avoid undue economic segregation. Put in another way, the Act only requires IHDA to avoid acting arbitrarily and capriciously with respect to the economic composition of a development.

The next question is whether IHDA's exercise of its discretion with respect to the development was arbitrary and capricious. Boiled down to its essentials, the appellees' complaint contains several specific allegations against IHDA: (1) that IHDA failed to consider the economic characteristics of the community and, more particularly, that it failed to conduct a formal market study; (2) that the income limits in the tenant-selection plan do not avoid undue economic homogeneity; (3) that IHDA arbitrarily abandoned a prior policy of funding and promoting mixed-income developments; and (4) that IHDA failed to request a waiver from HUD of the "very low income" requirements of section 8.

While it is probably not possible to enumerate all the kinds of acts or omissions which will constitute arbitrary and capricious conduct, the following guidelines apply. Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider

an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. (*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.* (1983), 463 U.S. 29, 43, 77 L. Ed. 2d 443, 458, 103 S. Ct. 2856, 2866-67.) While an agency is not required to adhere to a certain policy or practice forever, sudden and unexplained changes have often been considered arbitrary. (See 2 C. Koch, Administrative Law & Practice §9.6, at 101 (1985).) The standard is one of rationality. The scope of review is narrow and the court is not, absent a "clear error of judgment" (*Citizens to Preserve Overton Park, Inc. v. Volpe* (1971), 401 U.S. 402, 416, 28 L. Ed. 2d 136, 153, 91 S. Ct. 814, 823-24), to substitute its own reasoning for that of the agency.

Under this standard, the appellees' complaint adequately states a valid claim for relief. The appellees allege that IHDA failed to consider such relevant factors as the economic makeup of the surrounding neighborhood, failed to assess those factors using reasonable procedures, and arbitrarily abandoned a prior policy. IHDA's denials of these allegations, while not implausible, at best raise issues of fact which cannot be disposed of upon a judgment on the pleadings. Since they cannot, the trial court erred in granting judgment for IHDA on the pleadings; and we reverse and remand for further proceedings in the circuit court in accordance with this opinion.

### THE CLAIM AGAINST THE OWNERS AND DEVELOPERS

Count III of the appellees' complaint alleged that the development would violate various provisions in the Chi-

cago building code and the Chicago rehabilitation code. (Chicago Municipal Code ch. 24, §11—1 *et seq.* (1984-85); Chicago Municipal Code ch. 78.1 *et seq.* (1983).) More specifically, they claimed the following deficiencies: (1) that the rehabilitation would make the outer courtyards in the Ellis structures too small, and would not secure the basement apartments against water leakage, and (2) that the basement apartments in the Woodlawn structure are too far below grade. The complaint requested an injunction against the rehabilitation.

The trial court granted judgment to the appellant owners and developers following a hearing. The facts adduced at the hearing are recited where they are pertinent. We agree with the appellate court, however, that the facts are essentially undisputed. The trial court's ruling rested almost exclusively on its interpretation of various sections of the Chicago Municipal Code. The developers do not contest this interpretation directly, but instead claim only that the appellate court failed to give proper deference to a conflicting administrative interpretation. While they state that they neither "expect or request" review of the appellate court's interpretation, we do not believe we can meaningfully review the appellate court's decision without looking at the specific provisions of the building and rehabilitation codes. Therefore, after considering the preliminary issue of standing, we will consider whether the court's rulings as to each of the claimed deficiencies were correct.

### Standing

In Illinois, a private party's standing to enforce compliance with local ordinances affecting real property is governed by section 11—13—15 of the Illinois Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15). Under the Illinois Municipal Code, the owner or tenant of real property lying within 1,200 feet of property used in

violation of municipal or local ordinances may institute an action for noncompliance if the owner or tenant "shows that his property or person will be substantially affected by the alleged violation." On the other hand, the owner or tenant need not prove "any specific, special or unique damages to himself or his property or any adverse effect upon his property from the alleged violation in order to maintain a suit under the foregoing provisions." (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15.) The developers assert that the appellees lack standing because they have not proved that they will be substantially affected by the alleged violations.

Whether section 11—13—15 requires something more than mere proximity for standing, and what that something might be, are questions of first impression in this court. They are not, however, questions properly before us. The appellees argue, and we agree, that the developers' failure to raise this issue in the trial court constitutes a waiver which precludes us from considering it on appeal.

As we have previously stated, lack of standing in a civil case is an affirmative defense, which will be waived if not raised in a timely fashion in the trial court. (*In re Custody of McCarthy* (1987), 157 Ill. App. 3d 377, 380; *Marcus Corp. v. Village of South Holland* (1983), 120 Ill. App. 3d 300, 304; *Village of Hillside v. John Sexton Sand & Gravel Corp.* (1983), 113 Ill. App. 3d 807, 816; see also *Ray v. City of Chicago* (1960), 19 Ill. 2d 593, 601-02 (issue of whether special damages had been proven so as to provide plaintiffs with standing under predecessor statute to section 11—13—15 waived by failure of defendant to raise the issue in the trial court).) The developers do not contend that they at any time raised the issue of standing before the trial court.

In response, the developers cite the rule that an appellee may defend a judgment on review by raising an is-

sue not previously ruled upon by the trial court if the necessary factual basis for the determination of such a point is contained in the record. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147.) This rule is clearly inapplicable. While the issue raised on appeal need not have been previously ruled upon, it must at least be commensurate with the issues presented at trial. (*In re Estate of Leichtenberg* (1956), 7 Ill. 2d 545, 549.) Here, the developers did not present the issue of standing at trial. In consequence, the record is devoid of a factual basis for determining the issue of standing; we cannot say whether the standing of the appellees is based only upon proximity to the development or upon some other additional injury. Nor were the appellees put on notice that such proof was required. Moreover, acceptance of the developers' argument would require us to overrule *Ray v. City of Chicago* (1960), 19 Ill. 2d 593, in which the defendant similarly argued for the first time on appeal the plaintiff's lack of standing as a basis for the affirmance of the decision of the trial court. This we decline to do, and we proceed to the merits of the various claimed violations.

OUTER COURTS AND BASEMENTS IN<br>THE ELLIS STRUCTURES

The appellees make two arguments with respect to the rehabilitation of the Ellis structures. They first claim that the developers cannot lawfully rehabilitate the structures if, after the rehabilitation, the "outer courts" (*i.e.*, the courtyards on either side of the structures) will be less than eight feet in width. It is uncontested that the outer courts will in fact be four feet in width. The appellees also argue that the developers' plans to repair the basement apartments in the Ellis structures violate the rehabilitation and building codes because they do not

indicate that the units will be made impervious to water leakage.

The argument as to the outer courts turns in part upon the number of apartment units in the planned rehabilitation. Section 78.1—22 of the rehabilitation code states that "[i]n any residential building *** the number of dwelling units may be increased by one dwelling unit above the number of units constructed at the time the building was built, providing the *** [n]atural light and ventilation shall comply with the requirements of Chapter 81.1 [regarding natural light and ventilation requirements in new construction]." (Chicago Municipal Code ch. 78.1, §78.1—22(e) (1983).) The pertinent section of chapter 81.1 requires that outer courts be eight feet in width. Thus, if the rehabilitation increases the number of dwelling units by one above the number constructed at the time the building was built, the outer courts should be eight feet in width. The outer courts in the proposed rehabilitation are four feet in width.

Evidence introduced at trial established that the Ellis structures are composed of three adjoining, three-story buildings in an R4 residential district. (See Chicago Municipal Code ch. 194A, §7.3—4 (1984-85).) The buildings were originally constructed in 1914, with 6 dwelling units in each building, for a total of 18 units in all. In 1951 the buildings were converted, pursuant to a building permit issued by the City of Chicago, from 6 units in each building to 18 units in each building. In 1952, the owner, in violation of the permit, constructed 27 apartments in the center building. By court order entered in 1961, the center building was deconverted from the unpermitted 27 units to 24 units. Before the present rehabilitation, the Ellis structures contained no actual apartments because they were essentially "gutted" and "mere shells."

The developers intended to rehabilitate the Ellis structures so that there would be seven units in each building, for a total of 21 units for all three structures. Thus it is not disputed that the intended rehabilitation would increase the number of units in the Ellis structures by one unit greater than the number in existence when the buildings were originally constructed.

In the appellate court, the developers argued that other, related sections in the rehabilitation code precluded the application of section 78.1—22(e). (See Chicago Municipal Code ch. 78.1, §§78.1—21, 78.1—22, 78.1—23 (1983).) The developers do not repeat these arguments here, and we agree with the appellate court that all of these sections state additional requirements for rehabilitation which increases the number of dwelling units, and do not alter the requirement as to the width of the outer courts.

The developers also argued in the appellate court that section 78.1—22(e) does not apply where the number of dwelling units legally authorized to exist had been converted to a number greater than that permitted when the building was originally constructed. As the appellate court reasoned, this argument conflicts with the plain language of section 78.1—22(e), which specifically refers to the number of units "constructed *at the time the building was built.*" (Emphasis added.) (Chicago Municipal Code ch. 78.1, §78.1—22(e) (1984).) We also agree that section 78—63 of the Chicago Municipal Code is likewise inapplicable. Section 78—63 permits alterations in preordinance buildings (those built before July 8, 1957) that did not "comply[ ] with the requirements in force and applicable to the building at the time of its conversion" (Chicago Municipal Code ch. 78, §78—63 (1984)), so that those buildings could be made to comply with the chapter 78 minimum requirements for existing buildings. In other words, section 78—63 is designed to

secure compliance with the codes by means short of total demolition. The appellate court concluded, and we agree, that section 78—63 is not applicable to a building which is not currently occupied and which effectively contains no units at all. Since it has already been effectively "demolished," the application of section 78—63 would serve no purpose. Therefore the number of units permitted by the 1961 court order is irrelevant.

On this appeal, the developers do not dispute the merits of the appellate court's interpretation of section 78—63 but, instead, argue that the appellate court did not give proper deference to the interpretation of the rehabilitation code by the City of Chicago and the Chicago Department of Inspectional Services (DIS). It is undisputed that the developers submitted blueprints of their plan to DIS and that DIS issued building permits. The permits themselves contain no indication of why DIS issued the permits or its interpretation of the rehabilitation code. At trial, the developers called as an expert witness the coordinating architect in charge of plan examination for DIS to testify to DIS's interpretation of the code. The trial court specifically disclaimed any reliance on his testimony, calling it "disjointed, confused, and unintelligible."

We have said that we will give great weight and deference to the interpretation of an ambiguous statute by a public agency charged with the administration and enforcement of the statute. (*Illinois Power Co. v. Illinois Commerce Comm'n* (1986), 111 Ill. 2d 505, 510-11; *Illinois Consolidated Telephone Co v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152.) Those interpretations, while not binding, are considered an informed source in ascertaining the legislative intent because of the agency's experience and expertise. *E.g., Adams v. Jewel Cos.* (1976), 63 Ill. 2d 336, 344-45.

However, we need not give such deference here. First, it is by no means clear that DIS in fact interprets the rehabilitation code as the developers suggest. DIS is not a party to this action. The building permits themselves provide no explanation for DIS' approval. It is therefore at least possible that the approval resulted from ignorance or inadvertence rather than from a principled "interpretation" of the rehabilitation code. Were we to hold that agency action, standing alone, constituted an "interpretation," every agency action would be presumptively legal. Second, the rehabilitation code is not particularly ambiguous—it clearly states that rehabilitation which increases the number of units per building by one above the number in existence at the time of the original construction must comply with some of the requirements for new construction. Even an agency interpretation of an ambiguous statute is not binding, but only persuasive. Here, the statute is unambiguous, and the "interpretation" nonexistent.

The developers next argue that the issuance of the permit was a factual determination which should not be rejected by a court unless arbitrary and capricious. This is clearly not true; the facts at trial were virtually undisputed, and the trial court itself characterized its decision as based on a legal interpretation of undisputed facts. Therefore, this argument has no merit.

The developers next argue that our interpretation of the rehabilitation code should be influenced by a subsequent amendment to the code enacted by the Chicago city council. The amendment deleted from section 78.1—22 the words "constructed at the time the building was built," and added the words "legally established dwelling" before the word "units." The amended section 78.1—22 now begins: "In any residential building *** the number of dwelling units may be increased by one dwelling unit above the number of legally established

dwelling units provided the building complies with [various statutory requirements]." (Chicago Municipal Code §78.1—22 (eff. Oct. 28, 1987 (as amended)).) "Legally established dwelling units" are defined to mean "the number of dwelling units authorized to exist *** pursuant to the issuance of a valid building permit or authorized by a final and nonappealable court order." Chicago Municipal Code §78.1—21(a) (eff. Oct. 28, 1987 (as amended)).

In the past we have sometimes considered a subsequent legislative amendment to an ambiguous statute as a "clarification," with some bearing on our determination of the original legislative intent. However, it is equally clear that "an amendatory change in the language of a statute creates a presumption that it was intended to change the law as it theretofore existed." (*People v. Nunn* (1979), 77 Ill. 2d 243, 248.) This presumption may only be rebutted by evidence that "the legislature intended only to interpret the original act. *** Usually, an amendment of an unambiguous statute indicates a purpose to change the law, but no such purpose is indicated by the amendment of an ambiguous provision." (*People v. Youngbey* (1980), 82 Ill. 2d 556, 563.) Here there was nothing ambiguous about the number of units "constructed at the time the building was built," and the substitution of the number of "legally established dwelling units," as newly defined, was a modification. Moreover, there is no indication in the legislation that the amendment was meant to be applied retroactively. (See, *e.g., Rivard v. Chicago Firefighters Union* (1988), 122 Ill. 2d 303.) We therefore see no need to consider this subsequent change as evidence of the council's original intent.

We therefore find that the appellate court's determination that the four-foot-wide courts in the Ellis structures were illegally narrow was correct.

The appellees next argued that the developers' plans with regard to the basement apartments in the Ellis structures violate the Chicago Municipal Code because they provide no method for rendering the apartments impervious to water leakage in conformity with section 78.1—22(c) of the rehabilitation code. (Chicago Municipal Code ch. 78.1, §78.1—22(c) (1983).) At the hearing the appellees presented evidence that the basements in the Ellis structures are not currently impervious to water leakage. The trial court dismissed the appellees' case with regard to this violation at the close of their case and entered a directed judgment in favor of the developers.

We agree with the appellate court that this was error. The developers admit their plans did not contain a method for preventing water leakage. Under these circumstances, the trial court erred in directing judgment in favor of the developers.

Like the appellate court we note that the appellees' claim about the sanitary sewer pipe in the Ellis structures was dismissed without prejudice and need not be addressed here.

BASEMENT APARTMENTS IN THE WOODLAWN STRUCTURE

The appellees argue that the developers' plan to repair the basement apartments in the Woodlawn structure for residential purposes violates the rehabilitation code and the building code because the floors of the units will be more than two feet below grade.

Section 78.1—3 of the rehabilitation code provides in pertinent part that "[w]here there are not specific provisions in this article [i.e., the rehabilitation code] applying to the repair, alteration of, [or] additions to *** any existing building or structure or part thereof, then such building or part thereof shall be made to comply with the pertinent provisions of this Code for new buildings

or structures." (Chicago Municipal Code ch. 78.1, §78.1—3 (1983).) Basement rooms in newly constructed residential dwellings are governed by section 52—7 of the Code (Chicago Municipal Code ch. 52, §52—7 (1984)), which states that "[h]abitable rooms shall be permitted in a basement only when the floor is not more than two feet below finished grade level at all exterior walls containing openings required for natural light and ventilation." Since evidence submitted by the appellees indicated that the basement units at the Woodlawn structure were more than two feet below grade, we agree with the appellate court that the trial court's ruling in favor of the developers on this point must also be reversed.

The developers also argue in their reply brief that the appellate court's decision constitutes a taking of their property without just compensation, in violation of the fifth and fourteenth amendments to the United States Constitution. Arguments not raised until the reply brief are, of course, waived. 107 Ill. 2d R. 341(e)(7).

Lastly, the developers argue that the appellees' failure to seek a stay of the trial court's judgment and post a bond pursuant to our Rule 305 (107 Ill. 2d R. 305) precludes the appellees from prevailing on appeal. The developers assert they completed the rehabilitation while the appeal was pending. This argument is nearly identical to that rejected in *O'Laughlin v. City of Chicago* (1976), 65 Ill. 2d 183, 192. In *O'Laughlin* the plaintiff was granted an injunction instructing the city to restore his building permits. The city moved to stay the order in the appellate and trial courts, although not, apparently, in a timely fashion. During the pendency of the city's appeal, the plaintiff constructed the buildings and conveyed them to third parties. The appellate court reversed, holding that the plaintiff's construction was illegal, and remanded to the circuit court with directions to enter an order in favor of the city.

Responding to plaintiff's argument that the city was estopped, we stated that "the failure of the City to move for a stay of the order does not create a basis for equitable estoppel. The failure of the City to promptly request a stay in the circuit court neither precludes its right to an appeal nor prohibits it from receiving the relief it should have obtained in the lower court. To hold otherwise would substantially foreclose the appellate process in cases similar to the one at bar." (65 Ill. 2d at 192.) It is clear from this quotation that the holding in *O'Laughlin* did not depend upon the city's request for a stay in that case. Moreover, the developers cite no specific provision of Rule 305 which would support their claim of estoppel.

We acknowledge that the grant of equitable relief may depend in part upon the changed circumstance that the project has now actually been built. However, the appellees indicate in their brief that they are not requesting that the building be demolished for noncompliance with the codes, but only that the basement apartments be vacated. In any case, the trial court on remand will be free to fashion appropriate relief.

For the foregoing reasons, the judgment of the appellate court is affirmed, and the cause is remanded to the circuit court of Cook County for further proceedings consistent with the views expressed herein.

*Affirmed; cause remanded.*