(Nos. 57891, 58113 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CLAUDE ROUSH *et al.*, Appellees.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PAUL SCHYVE *et al.*, Appellees.

*Opinion filed April 4, 1984.*

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, Louis F. Stalzer, Richard T. Sikes, Jr., Paula Carstensen and Thomas A. Rieck, Assistant State's Attorneys, of counsel), for the People.

Louis B. Garippo, of Chicago, for appellee Dr. Paul Schyve.

Neil F. Hartigan, Attorney General, of Springfield (Maureen D. Mudron, Special Assistant Attorney General, of Chicago, of counsel), for appellees Dr. Ivan Pavkovic and the Department of Mental Health and Developmental Disabilities.

Mark J. Heyrman, of Chicago, *amicus curiae*, and, with Terry S. Arbit, law student, for intervenors Bernard Thiem *et al.*

JUSTICE CLARK delivered the opinion of the court:

This appeal requires us to determine whether a trial judge properly held directors of State mental institutions in criminal contempt of court following the escape of mental patients under their control. We are asked to determine the degree of control the judiciary can exercise over the administration of State mental hospitals and their employees. On July 17, 1981, a trial judge in the circuit court of Cook County entered a rule to show

cause why Dr. Claude Roush and the Manteno Mental Health Center should not be held in indirect criminal contempt of court. This action followed two escapes by Gary McConnell, a patient committed to Manteno after he was found not guilty by reason of insanity (NGRI) of various charges, including aggravated kidnaping. On September 1, 1981, Dr. Roush was held in contempt of court and ordered to provide 12 hours of counseling at Cook County jail or to pay a fine of $1,500.

Similarly, on June 14, 1982, the same trial judge issued a rule to show cause why Dr. Paul Schyve, acting director of the Illinois State Psychiatric Institute (the Institute) should not be held in contempt of court. This action followed the escape of Gary McConnell from the Institute on June 13, 1982. Dr. Schyve and Dr. Ivan Pavkovic, Director of the Department of Mental Health and Developmental Disabilities (the Department), appeared for several hearings in front of the trial judge. Dr. Schyve and Dr. Pavkovic appealed the trial judge's order of June 24, 1982, directing the Department to identify dangerous NGRI patients and place them in a secure area. The appellate court reversed the trial judge's order holding Dr. Roush in contempt of court (*People v. Roush* (1983), 112 Ill. App. 3d 689), and the appellate court also reversed the trial judge's order concerning Dr. Schyve and Dr. Pavkovic (*People v. Schyve* (1983), 112 Ill. App. 3d 777). We consolidated the two cases and granted the petitions for leave to appeal submitted by the State's Attorney of Cook County. 87 Ill. 2d R. 315(a).

On appeal, Dr. Schyve was represented by private counsel. Dr. Pavkovic, Dr. Roush and the Department were represented by the Attorney General of Illinois. Certain NGRI patients attempted to intervene in the case at bar, and they were represented by private counsel. The State's Attorney of Cook County presented the

arguments of the trial judge. The first case in this consolidated appeal, People v. Roush, No. 57891, is based on the following facts:

On November 12, 1978, Gary McConnell abducted Clara Zuckley in Lansing and forced her to accompany him in his car to Iowa. McConnell was armed with a sawed-off shotgun and held Zuckley captive for 12 to 14 hours and threatened to kill her. Zuckley was able to escape when McConnell stopped at a gas station, and McConnell was arrested a few days later. On January 9, 1979, McConnell was indicted for aggravated kidnaping, aggravated battery, burglary, home invasion, and the unlawful use of weapons. In November 1979, McConnell was declared unfit to stand trial and placed in the Chester Mental Health Center. He remained there from November 1979 to April 1981.

The trial judge determined that McConnell was fit to stand trial in April of 1981, and McConnell was found not guilty by reason of insanity of all counts of the indictment. McConnell was remanded to the Department of Mental Health and Developmental Disabilities and placed in the Manteno Mental Health Center, a mental hospital operated by the State of Illinois, on May 2, 1981. On May 15, 1981, McConnell was given a grounds pass while his parents were visiting Manteno. He stole his parents' car keys from his mother's purse, and drove the car out of the Manteno compound. Vaugh Schoon of the Lansing police department learned of the escape and set up surveillance at the home of Clara Zuckley. McConnell was seen driving past Zuckley's home. A high-speed chase ensued, and McConnell was finally arrested in Munster, Indiana, and returned to Manteno.

Dr. Claude Roush, director of Manteno, testified that the mental hospital is divided into several units, with varying levels of security. Manteno houses NGRI patients as well as mentally infirm individuals who have

not been charged with criminal offenses. McConnell was placed in the Singer 2 ward, but was transferred to his "home ward," Cullen 1, on June 12, 1981. This transfer was made because McConnell had been cooperative and demonstrated emotional stability during his confinement in Singer 2 ward. In the early morning of July 11, 1981, McConnell stuffed pillows under his sheets so it would appear he was in bed and escaped through the window of his dorm room. The Lansing police were alerted and surveillance was established at Zuckley's home.

On July 20, 1981, Zuckley left her home at 5:23 a.m. to go to work. McConnell was waiting outside Zuckley's home and seized her as she approached her car. Lansing police officers demanded that McConnell release the woman and a struggle ensued. McConnell was handcuffed and placed under arrest. Conflicting testimony was offered concerning the relationship between McConnell and Zuckley. The State has attempted to characterize McConnell as a violent man who was determined to kill Zuckley, yet Manteno offered uncontradicted testimony of Dr. Paul Finkel, clinical psychologist at Manteno, that Zuckley regularly visited McConnell at Manteno and she was observed sitting on McConnell's lap during one of her visits.

On July 17, 1981, the trial judge entered a rule to show cause why Dr. Roush and the Manteno Mental Health Center should not be held in indirect criminal contempt of court. Dr. Roush and Manteno were charged with failing to prevent the escape of McConnell in violation of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4). An extensive hearing was held and the following facts were elicited:

Cullen 1 ward had housed 63 NGRI patients in the two-year period preceding Dr. Roush's contempt proceedings. During this period, there were 32 unauthorized absences from Cullen 1 ward. Most of these NGRI pa-

tients were found wandering on the Manteno grounds shortly after their absence was detected, but two NGRI patients escaped from Manteno and never returned. Dr. Roush conceded that the absences constituted a "large and alarming figure," but he claimed budgetary restraints prevented him from fortifying the Manteno facility. Security screens were installed in Cullen 1 ward after the contempt hearing commenced.

As stated, on September 1, 1981, the trial judge found Dr. Roush and Manteno in contempt of court and ordered Dr. Roush to provide 12 hours of counseling services in Cook County jail, or to pay a fine of $1,500. On September 8, 1981, the trial judge entered the following order:

"1. No NGRI (not guilty by reason of insanity) patient [will] be given unsupervised grounds passes by the Manteno Mental Health Center without first giving the Court from which the patient was referred and the State's Attorney's Office one week's notice of its intention. During this time the Court and State's Attorney may take any appropriate action to oppose the pass.

2. NGRI patients at Manteno Mental Health Center will be confined in a secure area.

3. No NGRI patient at Manteno Mental Health Center will be allowed in any unsecure area of the above premises without giving one week's notice of such action to the Court from which the patient was referred, the State's Attorney's Office, and the victim, if any, on the charge the patient had been found NGRI.

4. The containment of all NGRI patients at Manteno Mental Health center shall be deemed a priority equal to the rehabilitation of such patients."

The second case in this consolidated appeal, People v. Schyve, No. 58113, is based on very similar facts, but some details should be noted. During the pendency of this appeal, Dr. Paul Schyve was acting director of the Illinois State Psychiatric Institute. In this capacity, Dr. Schyve was

responsible for the incarceration and treatment of NGRI patients. McConnell was placed in the Institute facility after his condition had improved during his period of confinement at Manteno. On June 13, 1982, McConnell escaped when another patient opened a locked door to McConnell's ward. Police apprehended McConnell and returned him to the Institute.

The Department of Mental Health and Developmental Disabilities is responsible for the operation of a State mental hospital in Elgin. The Elgin facility had also had difficulty with escaping NGRI patients. Extensive testimony was elicited from Dr. Schyve and Dr. Ivan Pavkovic, the Director of the Department, concerning the escape of Lawrence Stotts, a patient found NGRI of murder and assigned to the Elgin facility. On May 28, 1982, Stotts escaped from the mental hospital when a nurse opened the door to his ward and he ran out of the building into the surrounding cornfields. Stotts was returned to Elgin on June 1, 1982, but he escaped again on June 8, 1982. Stotts was not apprehended and returned to Elgin until June 22, 1982.

On June 14, 1982, the trial judge issued a rule to show cause why Dr. Schyve and the Institute as well as Dr. Pavkovic and the Department should not be held in contempt of court for allowing dangerous patients to escape. On June 14, 1982, Dr. Schyve filed a motion to dismiss the rule to show cause. The trial judge never made a ruling on Dr. Schyve's motion to dismiss.

On June 24, 1982, the trial judge entered the following order directed towards Dr. Pavkovic and the Department:

"1. That the Director of the Illinois Department of Mental Health immediately identify those NGRI residents who are dangerous to others.

2. That the Director of the Illinois Department of Mental Health immediately separate such persons from the general population and place them in a secure area.

3. That the Illinois Department of Mental Health give ten days written notice to the Court from which an NGRI resident is committed and to the State's Attorney of Cook County in which the Court is located whenever it plans to transfer an NGRI resident to a less secure area. The notice shall include not only the fact that the resident is being transferred but also that he or she will be in a less secure area and the reasons for the intended action and the facts upon which those reasons are based."

The trial judge denied Dr. Schyve's and Dr. Pavkovic's motion to vacate or stay the June 24, 1982, orders, prompting Dr. Schyve and Dr. Pavkovic to appeal. The appellate court reversed the trial judge's order (112 Ill. App. 3d 777, 782), and we consolidated Dr. Schyve's and Dr. Pavkovic's case with Dr. Roush's.

Several NGRI patients affected by the trial judge's order finding Dr. Roush in contempt of court filed a petition to intervene on September 8, 1981. This motion was denied by the trial judge, but upheld by the appellate court (112 Ill. App. 3d 689). Counsel for the NGRI intervenors correctly noted during the oral argument before this court that it is not necessary for us to consider the merits of the intervenors' arguments if we affirm the decisions of the appellate court. Since we are affirming the decisions of the appellate court, we will confine our discussion to the legal arguments raised by the State, Dr. Roush and Dr. Schyve.

We begin our discussion of the State's arguments by noting the jurisdictional basis for the case before us. Under the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(b)), a circuit court judge maintains jurisdiction over an NGRI patient he or she commits to a mental institution. (See Loverude, *The New Illinois Provisions for Defendants Found Not Guilty by Reason of Insanity*, 68 Ill. B.J. 528 (1980).) The State argues that the trial judge's orders fall within the parameters of section

5—2—4(b).

"Not more than 30 days after admission and every 60 days thereafter so long as the initial order for admission remains in effect, the facility director shall file a treatment plan with the court. Such plan shall include an evaluation of the defendant's progress and the extent to which he is benefitting from treatment. Such plan may also include off-grounds passes, home visits and participation in work programs; provided however, that any such off-grounds privileges have been approved by specific court order." Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4(b).

We do not agree with the State's interpretation of this provision, because the trial judge's orders were directed at all NGRI patients in Illinois. The great majority of these NGRI patients had never appeared before the trial judge, and were committed to State mental institutions by other circuit court judges. Thus, the orders issued by the trial judge were based on an overly expansive interpretation of section 5—2—4(b), and were properly rejected by the appellate court (*People v. Valdez* (1980), 79 Ill. 2d 74).

We next consider the propriety of the sanctions imposed by the trial judge. Dr. Roush was assessed with criminal penalties without a jury trial or opportunity to waive such a proceeding. Dr. Pavkovic was ordered to notify the trial judge every time an NGRI patient was transferred to a less secure area. We believe that Dr. Roush's criminal contempt penalty was not warranted. Only wilful conduct can constitute indirect criminal contempt (*People v. Witherspoon* (1977), 52 Ill. App. 3d 151), and there is no evidence that Dr. Roush intentionally violated any directive of the trial judge. Dr. Roush was summoned to the circuit court and asked to account for past actions of NGRI patients. Although we share the trial judge's concern for the danger posed by NGRI patients, holding Dr. Roush in contempt of court strikes us as fundamentally inappropriate. Under this

theory, prison wardens could receive jail sentences if inmates were clever enough to escape from State penitentiaries. We conclude that the appellate court properly reversed Dr. Roush's criminal contempt penalties.

Both Dr. Roush and Dr. Pavkovic were given detailed orders concerning the administration of their respective institutions. In Illinois, it is well settled that when public officials are given discretionary administrative powers, courts of equity are reluctant to control or review the exercise of the power absent fraud, corruption, oppression or gross injustice. (*Trustees of Schools v. School Directors* (1901), 190 Ill. 390, 393; *Bongi Cartage, Inc. v. City of Chicago* (1961), 33 Ill. App. 2d 433, 438; *Mister Softee of Illinois, Inc. v. City of Chicago* (1963), 42 Ill. App. 2d 414, 422.) Courts are particularly reluctant to get involved in the day-to-day administration of prisons (*In re Washington* (1976), 65 Ill. 2d 391, 399), because such decisions can best be made by administrators vested with such authority, rather than judges. (*People v. Adams* (1976), 35 Ill. App. 3d 810, 814.) Every factual situation has its own contours, and there could be situations in the future where the director of a State mental hospital could be held in contempt of court because of gross violations of his statutory duties, but this is not a situation we are confronted with at the present time. See Bazelon, *Implementing the Right to Treatment,* 36 U. Chi. L. Rev. 742 (1969); see also Weiner, *Not Guilty by Reason of Insanity: A Sane Approach,* 56 Chi.-Kent L. Rev. 1057 (1980).

We therefore conclude that the trial judge's actions were not warranted by the authority given to circuit judges to supervise NGRI prisoners in State mental institutions. The public should be protected against escaping NGRI patients, but criminal contempt sentences and detailed orders supervising the patients' activities are not appropriate remedies based on the facts presented in this case. The judgments of the appellate court are affirmed.

*Judgments affirmed.*