MARY ANN MOORE, Indiv. and as Next Friend for her Minor Children, Marchello Moore, *et al.*, and on Behalf of All Others Similarly Situated, *et al.*, Plaintiffs-Appellants, v. JOHN LUMPKIN, Director of the Department of Public Health, *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—93—2491

Opinion filed February 10, 1994.

982

Laureen M. Heybach, Robert E. Lehrer, Patricia Nix-Hodes, and Joan Matlack, all of Legal Assistance Foundation of Chicago, Alan M. Posner, Sanford M. Pastroff, and Ronald S. Bell, all of Sonnenschein, Nath & Rosenthal, and Thomas H. Geoghegan, all of Chicago, for appellants.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of counsel), for appellees John Lumpkin and Department of Public Health.

Jack O'Malley, State's Attorney, of Chicago (Karen Covy, Patricia Moser, and Dominique Martin, Assistant State's Attorneys, of counsel), for other appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs appeal the decision of the circuit court of Cook County dismissing their class action complaint for declaratory and injunctive relief against the defendants, the Illinois Department of Public Health and its Director, John Lumpkin, M.D. (State defendants); Richard M. Daley, mayor of Chicago, the Chicago Board of Health and its president, Whitney Addington, M.D., and the Chicago Department of Health (City defendants); and the Cook County Board of Commissioners as the Cook County Board of Health (incorrectly sued as the Cook County Board of Commissioners) and the County of Cook (incorrectly sued as the Bureau of Health Services) (County defendants). The complaint alleges that certain actions and inactions of defendants regarding efforts to restrict and suppress the spread of tuberculosis (TB) in Chicago violated section 2 of the Department of Public Health Act (DPHA) (20 ILCS 2305/2 (West 1992)), entitled "Powers and duties," which concerns both State and local public health authorities. That provision states in pertinent part:

"The State Department of Public Health has general supervision of the interests of the health and lives of the people of the State. *** The Department may adopt, promulgate, repeal and amend rules and regulations and make such sanitary investigations and inspections as it may from time to time deem necessary for the preservation and improvement of the public health ***[.]

\* \* \*

All local boards of health, health authorities and officers, police officers, sheriffs and all other officers and employees of the state or any locality shall enforce the rules and regulations so adopted. \*\*\*

The Department of Public Health shall investigate the causes of dangerously contagious or infectious diseases, especially when existing in epidemic form, and take means to restrict and suppress the same, and whenever such disease becomes, or threatens to become epidemic, in any locality and the local board of health or local authorities neglect or refuse to enforce efficient measures for its restriction or suppression or to act with sufficient promptness or efficiency, or whenever the local board of health or local authorities neglect or refuse to promptly enforce efficient measures for the restriction or suppression of dangerously contagious or infectious diseases, the Department of Public Health may enforce such measures as it deems necessary to protect the public health, and all necessary expenses so incurred shall be paid by the locality for which services are rendered. \*\*\*

As used in the Act, 'locality' means any governmental agency which exercises power pertaining to public health in an area less than the State." 20 ILCS 2305/2 (West 1992).

The complaint further alleges that the County defendants have also violated section 5—25013(A)(7) of the Counties Code (55 ILCS 5/5—25013(A)(7)(West 1992)), which states that a board of health shall, "[w]ithin its jurisdiction, and professional and technical competence, investigate the existence of any contagious or infectious disease and adopt measures, not inconsistent with the regulations of the State Department of Public Health, to arrest the progress of the same." 55 ILCS 5/5—25013(A)(7)(West 1992).

According to the complaint, TB is an acute or chronic infectious pulmonary disease characterized by "fever, chills, night sweats, malaise, weight loss, coughing, the accumulation of sputum, chest pain and difficulty in breathing." The complaint states that, although the disease is fatal within five years in approximately 50% of the cases which go untreated, most TB patients are treatable and "highly curable" where there is early diagnosis and treatment. Plaintiffs aver that TB can be detected (1) by administering a relatively inexpensive skin test and measuring the skin reaction 48 to 72 hours later and (2) where skin test results are positive, by taking a chest X ray to determine if the patient has active TB.

The complaint further states that 6 to 12 months of preventive therapy may be needed for persons who have positive skin test results but do not have active TB, while those with active TB usually receive a multiple-drug treatment regimen for six to nine months. In some active cases, "directly observed therapy" (DOT) is indicated, i.e., medication is administered under the direct supervision of a health care worker. Where the treatment regimen is not completed or drugs are prescribed improperly, certain strains of TB become resistant to the standard treatment drugs.

According to the complaint, tuberculosis is caused mainly by inhalation of airborne particles containing bacteria, resulting in a substantially higher risk of infection among those persons in close contact with infected persons. Plaintiffs allege that tuberculosis is a "dangerously contagious disease" as that term is defined in the DPHA and a "contagious and infectious disease" under the terms of the Counties Code. They further allege that tuberculosis exists in epidemic proportions in certain areas of Chicago and among the homeless in Chicago and that a tuberculosis epidemic is threatened in Chicago, as a whole, and in Cook County.

The complaint alleges that there were 751 confirmed active TB cases in Chicago in 1991 and 793 cases in 1992, amounting to 60% of

all reported cases in Illinois; that the annual incidence of new TB cases in Chicago rose 22% over the period 1987-1992; that the percentage of Chicago inhabitants with TB is four times that for the rest of Cook County and six times that for the rest of the State; and that in 1991 there were active TB cases in 17 Chicago public schools.

Plaintiffs also allege that, while the TB rate in Chicago as a whole is 28.5 cases per 100,000, the rate among Chicago's increasing homeless population is 90 cases per 100,000 and that the neighborhoods with the highest number of reported TB cases in 1991 and 1992 were among the poorest neighborhoods with the greatest number of homeless persons, including Chicago's Uptown, Austin, Grand Boulevard, Near West Side, North Lawndale, New City and West Englewood areas. Plaintiffs aver that the incidence of TB is substantially higher among the poor because poor housing, insufficient health care, and poor nutrition are contributing factors to the spread of the disease. It is alleged that homeless persons are at particular increased risk because the likelihood of contracting TB is greater in cramped, poorly ventilated living or sleeping quarters, a condition allegedly existing in many shelters for the homeless.

Plaintiffs allege that the State defendants have violated section 2 of the DPHA (20 ILCS 2305/2 (West 1992)), in that they have (1) failed to investigate the causes of, and to take means to suppress and restrict, TB in Chicago, except that they have compiled data provided by the City defendants and they have provided limited technical assistance to the Chicago Department of Health; (2) failed to ascertain whether the City defendants and the County defendants have taken efficient measures to restrict and suppress TB in Chicago; and (3) failed to ensure implementation of an effective public awareness campaign, an effective program for screening populations at risk for TB, an effective program for appropriate treatment to TB sufferers, or an effective system for tracking or reporting TB cases.

The allegations against the City defendants are that they have violated the same statute by failing to enforce efficient measures to restrict and suppress TB in Chicago. Specifically, the complaint alleges that the City defendants have (1) failed to implement an effective public awareness campaign regarding TB; (2) failed to implement an effective program for TB screening and diagnosis among populations at high risk of infection, in that the City defendants have not met their own screening and diagnosis goals and have not conducted regular screening in homeless shelters or Chicago public schools; (3) failed to provide preventive therapy or ensure completion of such medically indicated therapy for some persons; (4) failed to provide adequate alternative housing for a sufficient number

of homeless persons with active TB; (5) failed to implement an effective treatment program for persons with active TB; and (6) failed to implement an effective case reporting and tracking system. Plaintiffs state in their brief that this failure to enforce efficient measures to restrict TB includes failure to enforce State public health regulations which adopt the TB guidelines of the Center for Disease Control. For example, the regulations require availability of health education materials to schools and information on disease trends to health care providers, appropriate inpatient, outpatient and home care services as defined by the American Thoracic Society, and follow up for at least 90% of persons in close contact with active TB patients. (See 77 Ill. Adm. Code § 615.350 (1990).) The complaint, however, does not explicitly allege violations of State regulations in particular.

The plaintiffs' claims against the County defendants primarily pertain to conduct at two facilities located in Chicago and operated by Cook County: Cook County Hospital, which serves residents of Cook County, including Chicagoans, and Cermak Health Services, which provides medical services to Cook County jail inmates. Specifically, plaintiffs charge that, in violation of section 2 of the DPHA and section 5—25013 of the Counties Code, an insufficient number of isolation rooms is available at Cook County Hospital or Cermak Health Services, the number of TB field workers is insufficient to provide necessary patient follow-up and supervised therapy for patients at those facilities, and no screening program exists among county employees working at Cook County jail, where there is a high incidence of TB. Plaintiffs also claim that the County defendants have failed to take necessary measures within Chicago which are required to prevent the spread of a TB epidemic to suburban Cook County.

In May 1993, the named plaintiffs filed a two-count complaint on behalf of themselves and a class consisting of "all persons in Chicago, Illinois who, on or after January 1, 1991, have been, are or will be 'homeless' as defined in 42 U.S.C. § 11302(2)." Of the named plaintiffs, two are alleged to have contracted TB, while the others are alleged to be at an increased risk of contracting the disease because of defendants' failure to provide efficient measures to restrict TB in Chicago.

One of the class representatives is a homeless Chicago man who was diagnosed with TB at a private hospital in 1990. The complaint alleges that, although he received medication from the private hospital and later from Cook County Hospital, he did not receive proper medical follow up from the Chicago Department of Health or Cook County Hospital, resulting in his TB becoming resistant to two

drugs commonly used in treatment. According to the complaint, although he currently receives weekly treatment from a Chicago Department of Health nurse, he is in need of a stable living situation for the duration of his therapy.

Also named as class representatives are three Chicago women and their minor children, all of whom are homeless and reside in homeless shelters in Chicago. They allege that the shelters are often overcrowded and poorly ventilated, sometimes with all residents either sleeping or eating in one room. The children attend Chicago public schools. These plaintiffs allege that, because of defendants' actions and inactions, particularly as they affect the homeless and children in Chicago public schools, they are at a substantially greater risk of contracting TB than they would be if defendants had taken proper measures to restrict and suppress the disease.

In addition to the class representatives, the named plaintiffs include a child living in Harvey, Illinois, which is located outside Chicago in suburban Cook County. He was diagnosed with TB in January 1992, but is currently in remission. The complaint stated that, as an infant, he contracted TB in 1991 from a man living with his family. The man had TB, which he may have contracted while homeless in Chicago. The complaint alleges that, because the child travels between Harvey and Chicago, where several of his relatives live, he is at a higher risk of a recurrence of TB and there is also a higher risk of his transmitting TB to his family in Harvey and in Chicago than there would be if defendants took proper measures to suppress TB in Chicago. His mother and a sibling, both of whom reside with him and are therefore in close contact with him, are also named plaintiffs. The complaint alleges that, due to this close contact, the mother and sibling are at increased risk of contracting TB as a result of defendants' failure to take proper measures to restrict and suppress TB in Chicago.

The remaining named plaintiffs are alleged to be at an increased risk of contracting TB either because they are homeless and/or have children attending Chicago public schools or because they are employed at, or are performing volunteer services in, homeless shelters or schools in Chicago where the risk of TB is high. According to the complaint, all of these plaintiffs, by frequent close contact with persons in the shelters or the school, are at a substantially higher risk of contracting TB than they would be if defendants were taking proper measures to suppress TB in Chicago. Also, the two volunteers, who currently work in shelters where TB screening is offered, are allegedly deterred from working in other shelters where, because of defendants' inaction, no such screening occurs. Plaintiffs state that,

because of defendants' conduct regarding TB in Chicago, they and persons in the class they represent are threatened with irreparable injury, including "contracting TB; suffering pain and permanent and life-threatening physical injury from contracting TB; anxiety and distress caused by fear of contracting TB and fear of exposing others (including family members) to a potentially fatal disease."

Under count I, they seek a declaration that all defendants violated section 2 of the DPHA and an injunction prohibiting defendants' continued pursuit of any actions, policies or practices declared to be violative of that act and requiring defendants to conduct a study of TB in Chicago and to formulate a detailed plan for court approval and supervision until TB is no longer epidemic or threatening to become epidemic within Cook County. The complaint details several items which plaintiffs wish to have included in the court-approved plan, such as periodic TB screening in homeless shelters, drug abuse/alcohol treatment centers, public health clinics, AIDS clinics, and schools attended by children at high risk; more teams of public health caseworkers for screening, follow up, and treatment; incentives for compliance with treatment, such as meals, clothing, safe and adequate housing; isolation rooms at Cook County Hospital for all TB patients who need them; more X-ray equipment, particularly portable equipment; specialized housing for persons having difficulty following treatment plans; a comprehensive tracking system for those receiving treatment; and identification of shelters where homeless are exposed to TB and implementation of necessary action, such as adequate housing, to protect the homeless from such exposure.

Count II seeks a declaration that the County defendants have violated section 5—25013(A)(7) of the Counties Code and an injunction prohibiting continuation of such actions and inactions and directing a study and court approved and supervised plan for effectively restricting and suppressing TB in Chicago.

All defendants filed motions under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)), requesting dismissal. The trial court dismissed plaintiffs' action with prejudice on the grounds that a private right of action could not be implied under either of the two statutes under which plaintiffs claimed such a right.

OPINION

In reviewing a dismissal pursuant to a section 2—615 motion by defendants, the question is whether the facts alleged, when viewed in the light most favorable to the plaintiffs, adequately state a cause of action. (*County of Cook v. City of Chicago* (1992), 229 Ill. App. 3d 173,

175, 593 N.E.2d 928.) Dismissal is proper only if it is apparent that no set of facts can be proven which will entitle the plaintiffs to relief. *Sawyer Realty Group, Inc. v. Jarvis* (1982), 89 Ill. 2d 379, 383, 432 N.E.2d 849.

We first consider whether a private right of action exists for violations of section 2 of the DPHA (20 ILCS 2305/2 (West 1992)). In making that determination, the primary focus is on the intent of the legislature in enacting the statute. (*Sawyer*, 89 Ill. 2d at 388.) In ascertaining legislative intent, a court first considers the language of the statute itself, as that is the best indication of the drafters' intent. (*Byrne v. City of Chicago* (1991), 215 Ill. App. 3d 698, 707, 579 N.E.2d 19.) Where the legislature's intent can be determined by looking to the language of the statute, giving the words their ordinary meanings unless otherwise indicated, that intent must be given effect without resort to other means of statutory construction. (*Byrne*, 215 Ill. App. 3d at 707.) The statute should be read as a whole, considering each relevant section as it relates to other sections. *Kraft, Inc. v. Edgar* (1990), 138 Ill. 2d 178, 189, 561 N.E.2d 656.

The DPHA contains no language which expressly grants a private right of action. (See 20 ILCS 2305/2 *et seq.* (West 1992).) However, the fact that there is no such explicit language is not necessarily dispositive because a court, considering the totality of circumstances, may determine that a private right of action can be implied in the statute. (*Sawyer*, 89 Ill. 2d at 386-87.) We note, however, that, although a court can imply a private right of action where it is clearly needed to effectuate the purposes of a statute, "the judiciary by implying causes of action is assuming policy-making authority, a power more properly exercised by the legislature. The court should exercise such authority with due caution." *Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 606, 480 N.E.2d 1176; see also *Parra v. Tarasco, Inc.* (1992), 230 Ill. App. 3d 819, 825, 595 N.E.2d 1186.

■ The Illinois Supreme Court has distilled the analysis of legislative intent regarding a private right of action into four prerequisites, all of which must be satisfied before a private right of action under a statute will be implied: (1) the plaintiff is a member of the class of persons for whose benefit the statute was enacted; (2) plaintiff's injury is one which the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) a private right of action is necessary to effectuate the purposes of the act, *i.e.*, to provide an adequate remedy for violations of the statute. (*Rodgers v. St. Mary's Hospital* (1992), 149 Ill. 2d 302, 308, 597 N.E.2d 616; *Corgan v. Muehling* (1991), 143 Ill. 2d 296, 312-13, 574 N.E.2d 602; *Board of Education v. A,C,&S, Inc.* (1989),

131 Ill. 2d 428, 470, 546 N.E.2d 580; see also *Sawyer*, 89 Ill. 2d at 389.) While plaintiffs urge that all four requirements are satisfied in the context of the Department of Public Health Act (20 ILCS 2305/2 *et seq.* (West 1992)), defendants contend that none are satisfied.

The first prerequisite is that plaintiffs must be members of a class of persons for whose benefit the statute was enacted. The purposes of the DPHA are not explicitly enumerated in the statute, and there is no legislative history to aid us. However, plaintiffs urge, and we agree, that, as stated in *County of Cook*, a purpose of section 2 of the DPHA is "to protect the public by the containment of highly contagious diseases, especially those reaching epidemic levels." (*County of Cook*, 229 Ill. App. 3d at 177.) Although defendants contend that the purpose of section 2, and of the DPHA in general, is to provide a regulatory scheme under the sole authority and administration of the State Department of Public Health (the Department), they do not dispute that the ultimate objective of such a regulatory scheme is protecting the health of the public at large. That purpose is apparent from the language of section 2 giving the Department supervision of "the interest of the health and lives of the people of the State" and empowering the Department to make investigations and inspections it deems "necessary for the preservation and improvement of the public health" and to enforce measures it deems "necessary to protect the public health." (See 20 ILCS 2305/2 (West 1992).) Furthermore, while plaintiffs in this case constitute a class of persons who are alleged to have been especially harmed by violation of the statute, it is clear and undisputed by plaintiffs that the statute seeks to protect not only those persons who are at increased risk of contracting certain contagious diseases, but to protect each and every person in Illinois, as nearly as possible, from contagion reaching epidemic levels.

Plaintiffs contend that, because the statute was enacted for the benefit of the public and all plaintiffs are obviously members of the public, the first requirement is satisfied. Defendants, however, claim that no private right of action can be implied where the statute is enacted for the benefit of the public at large, rather than a particular segment of the public.

While there is little discussion of this issue in Illinois decisions, it has been the subject of extensive discussion under Federal authority. (See, *e.g.*, *California v. Sierra Club* (1981), 451 U.S. 287, 295-98, 68 L. Ed. 2d 101, 109-10, 101 S. Ct. 1775, 1780-81; *Cort v. Ash* (1974), 422 U.S. 66, 78, 45 L. Ed. 2d 26, 36, 95 S. Ct. 2080, 2088; *Howard v. Pierce* (6th Cir. 1984), 738 F.2d 722, 726 (discussed below).) The Federal cases dealing with implication of a private right of action have

focused on whether the legislature intended to create enforceable rights in a particular group of persons. Where a statute is intended to benefit the public at large, rather than a certain segment of the population, an intent to create enforceable rights is not recognized and no private right of action exists unless the statute explicitly sets forth that right. See *Cort*, 422 U.S. at 78, 45 L. Ed. 2d at 36, 95 S. Ct. at 2088 (first relevant factor is whether plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted' [citation]—'that is, does the statute create a federal right in favor of the plaintiff?' ") (emphasis in original).

In *California v. Sierra Club* (1981), 451 U.S. 287, 68 L. Ed. 2d 101, 101 S. Ct. 1775, the plaintiffs, members of an organization promoting conservation, sought an injunction against various Federal and State officials, claiming that certain proposed diversions of water in the Sacramento-San Joaquin Delta area would violate the Rivers and Harbors Appropriation Act of 1899. (*California v. Sierra Club*, 451 U.S. at 291, 68 L. Ed. 2d at 106, 101 S. Ct. at 1778.) The Supreme Court applied factors enunciated in *Cort* for determining whether a private remedy is implicit, although not expressly provided for, in a statute, the first factor being that the plaintiff must be a member of a class of persons "for whose especial benefit the statute was enacted." (Emphasis omitted.) (*Cort*, 422 U.S. at 78, 45 L. Ed. 2d at 36, 95 S. Ct. at 2088.) In *California v. Sierra Club*, the plaintiffs reasoned that because they were especially harmed by the obstructions of the navigable waters in violation of the Rivers and Harbors Appropriation Act, just as plaintiffs in the present case allege they are especially harmed by defendants' actions, this first requirement was satisfied. (*California v. Sierra Club*, 451 U.S. at 292, 68 L. Ed. 2d at 107, 101 S. Ct. at 1779.) The Supreme Court stated that the reasoning in *Cort* did not lend itself to such broad interpretation. Because the Act was designed to benefit the public at large, the Court found that no private right of action could be implied. (*California v. Sierra Club*, 451 U.S. at 294-97, 68 L. Ed. 2d at 107-10, 101 S. Ct. at 1779-81.) The Court wrote:

"The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries. [Citation.]

In ascertaining this intent, the first consideration is the language of the Act. Here, the statute states no more than a general proscription of certain activities; it does not unmistakably focus on any particular class of beneficiaries whose welfare Congress intended to further. Such language does not indicate an intent to provide for private rights of action. \*\*\*

\* \* \*

\*\*\* The language of the statute and its legislative history do not suggest that the Act was intended to create federal rights for the especial benefit of a class of persons but rather that it was intended to benefit the public at large through a general regulatory scheme to be administered by the then Secretary of War. Nor is there any evidence that Congress anticipated that there would be a private remedy." *California v. Sierra Club*, 451 U.S. at 294-98, 68 L. Ed. 2d at 107-10, 101 S. Ct. at 1779-81.

This rationale was also discussed in *Howard v. Pierce* (6th Cir. 1984), 738 F.2d 722. There, the court implied a private right of action under an amendment to the Housing Act of 1937 (42 U.S.C. § 1437a (1988)), finding that it was enacted for the especial benefit of low income public housing tenants. The court stated:

"Although the plaintiff may be a member of the public and thus an intended beneficiary of the statute, the likelihood that Congress intended members of the general public to enforce such statutes is not great. In contrast, the inference that Congress intended to create legally enforceable rights is strongest when the statutory language focuses unmistakably on a specific and identifiable class of beneficiaries." (*Howard*, 738 F.2d at 726.)

See also *City of Evanston v. Regional Transportation Authority* (7th Cir. 1987), 825 F.2d 1121, 1123, *cert. denied* (1988), 484 U.S. 1005, 98 L. Ed. 2d 649, 108 S. Ct. 697 ("If the language of the statute and its legislative history do not indicate that the statute was intended to benefit a particular class of persons, then the court need not consider other factors").

While *Cort* and other Federal cases state that plaintiff must be in the class of persons "for whose especial benefit the statute was enacted" (emphasis omitted) (see *Cort*, 422 U.S. at 78, 45 L. Ed. 2d at 36, 95 S. Ct. at 2088; see also *California v. Sierra Club*, 451 U.S. at 293, 68 L. Ed. 2d at 107, 101 S. Ct. at 1779), the Illinois cases do not use the word "especial." Instead, the Illinois cases speak of a "particular" class of individuals the statute was designed to protect. (See, *e.g.*, *Sawyer*, 89 Ill. 2d at 386 (wherein our supreme court stated that "when a statute is enacted to protect a *particular class of individuals*, courts may imply a private cause of action for a violation of that statute although no express remedy has been provided." (Emphasis added.)) See also *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 128 N.E.2d 691.) We note also that in *Sawyer*, the court traced the etiology of the Illinois standard for determining the legislature's intent in such cases to the test first articulated in *Cort* and held that the Illinois standard is "not dissimilar" to that Federal test. *Sawyer*, 89 Ill. 2d at 388-89.

In *People of State of Illinois ex rel. Trust Co. v. Maryland Casualty Co.* (7th Cir. 1942), 132 F.2d 850, a Federal court interpreted the Illinois statute creating the Department of Public Health (Ill. Rev. Stat. 1941, ch. 127, pars. 3, 55 *et seq.*). Damages were sought against several State officials, including the Director of the Department of Public Health, when construction workers contracted typhoid from contaminated water while working at Manteno State Hospital. (*Maryland Casualty*, 132 F.2d at 851.) The plaintiffs contended that the Director of Public Health had breached his duties under the statute which, like the statute at issue in the present case, charged the Department of Public Health with a duty to supervise the health and lives of the people of Illinois and to investigate the causes of dangerously contagious and infectious diseases when existing in epidemic form. The court stated:

> "[I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution.
>
> &ast;&ast;&ast;
>
> Since the officers in this case were discharging a public duty and not a duty they owed the individuals in the case at bar, there can be no liability on the part of the officers to such parties."
> *Maryland Casualty*, 132 F.2d at 852-53.

Plaintiffs cite *Corgan* in support of their position that the first requirement for implication of a private right of action is satisfied because they are members of the general public. In *Corgan*, the statute at issue was the Psychologist Registration Act (Ill. Rev. Stat. 1981, ch. 111, par. 5301 *et seq.*). A patient sought to bring an action under the statute against the defendant, who allegedly practiced psychology without a valid certificate of registration and, under the guise of therapy, engaged in sexual intercourse with the patient. (*Corgan*, 143 Ill. 2d at 300.) Although there is language in that case that the plaintiff, as a member of the public, was within the class which the Psychologist Registration Act was designed to protect, it is clear from its context that the supreme court in *Corgan* applied to the Psychologist Registration Act the same rationale as was applied by that court to the Real Estate Brokers and Salesmen License Act (Ill. Rev. Stat. 1977, ch. 111, par. 5701 *et seq.*) in *Sawyer*. Characterizing the status of the plaintiff in *Corgan* as a patient of the defendant who practiced psychology in violation of the statute (*Corgan*, 143 Ill. 2d at 313), the court stated in *Corgan*, as it had in *Sawyer*, "This court has held that '[w]hen a statute is enacted for the protection of a

*particular class of individuals,* a violation of its terms may result in civil as well as criminal liability, even though the former remedy is not specifically mentioned therein.' " (Emphasis added.) (*Corgan,* 143 Ill. 2d at 313, quoting *Heimgaertner,* 6 Ill. 2d at 155; see also *Sawyer,* 89 Ill. 2d at 386.) Moreover, in finding an implied private right of action, the supreme court in *Corgan* relied heavily on its analysis in *Sawyer* (see *Corgan,* 143 Ill. 2d at 314), which, as previously noted, traces the derivation of the Illinois standard to the Federal test articulated in *Cort* and its progeny. (*Sawyer,* 89 Ill. 2d at 388.) Thus, we conclude that our supreme court in *Corgan,* in finding an implied private right of action, recognized that the statute there in question was not intended for all members of the public but was intended, as in *Sawyer,* to benefit a particular class of persons. However, even if we abandoned the Federal analysis which *Sawyer* and *Corgan* appear to follow and held that being a member of the public at large is sufficient under the first of our supreme court's four prerequisites, a private right of action cannot be implied under the DPHA because, as discussed below, the third and fourth prerequisites (see *Rodgers,* 149 Ill. 2d at 308) are not met.

We turn next to the second prerequisite for implication of a private right of action, that plaintiff's injury be one which the statute is intended to prevent. Defendants claim this requirement is not met because plaintiffs have suffered no injury in fact. Defendants characterize plaintiffs' injury as a fear of contracting TB and contend that such an "injury" is not an injury in fact, as it is too speculative. They urge us to apply the same standard for injury here as is applied in questions of standing. (See *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 493, 524 N.E.2d 561.) As noted in *Greer,* with respect to the question of standing to sue, the injury alleged can be actual or threatened, so long as it is an "injury in fact," *i.e.,* it is distinct and palpable, fairly traceable to defendants' conduct and substantially likely to be prevented or redressed by the relief requested. (*Greer,* 122 Ill. 2d at 492-93.) We note that in the present case, the injuries alleged by the plaintiffs vary in nature, specificity and degree. According to the complaint, some plaintiffs live with persons who have TB and, by virtue of their continued contact with TB sufferers, they are at a substantially increased risk of contracting the disease. The complaint also alleges that the homeless plaintiffs and the class they represent are at a significant and quantifiable risk of contracting TB (more than three times the risk of Chicagoans in general) and, because of such contact with TB sufferers, are in need of screening procedures, preventive therapy, and possibly treatment for active TB which defendants allegedly are not providing at appropriate levels to restrain and suppress an epidemic.

■ We need not here determine the sufficiency of all claims by all of the plaintiffs. The threatened injury to some plaintiffs is greater in degree than for other plaintiffs. However, taking the well-pleaded facts as true, which we must do in reviewing a dismissal pursuant to a section 2—615 motion (*Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.* (1992), 229 Ill. App. 3d 119, 123, 593 N.E.2d 872), it is sufficient that, at least among those plaintiffs living with infected family members or sharing living quarters with infected persons in homeless shelters, the threatened injury of increased risk for contracting TB is identifiable, quantifiable, and substantially higher than the risk to the general public. It is alleged that this increased risk is traceable to defendants' violation of the statutory duty to take efficient measures to restrict the epidemic growth of TB. At least as to those plaintiffs, that increased threat should be deemed to constitute an injury so as to give them a direct stake in the outcome of the litigation. (See *Greer*, 122 Ill. 2d at 492-93; see also *United States v. Students Challenging Regulatory Agency Procedures* (1972), 412 U.S. 669, 687, 37 L. Ed. 2d 254, 269, 93 S. Ct. 2405, 2415-16 (where United States Supreme Court stated that to establish standing the injury must be to the plaintiff himself and must be such that it gives the plaintiff a "direct stake in the controversy"); *cf. Havens Realty Corp. v. Coleman* (1982), 455 U.S. 363, 71 L. Ed. 2d 214, 102 S. Ct. 1114.) Thus, contrary to defendants' contention, we believe that the second of our supreme court's prerequisites has been met by at least some of the plaintiffs and a dismissal of the entire complaint under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)) because of this prerequisite, therefore, would not be warranted.

The third prerequisite is that implication of a private right of action must be consistent with the underlying purpose of the statute. We note at the outset that governmental action to restrict and suppress the spread of contagious diseases falls within the scope of a State's police powers. (*People ex rel. Barmore v. Robertson* (1922), 302 Ill. 422, 427, 134 N.E. 815.) As such, broad discretion as to the manner in which this power is exercised has traditionally been accorded to agencies acting under the authority granted them by the legislature. (*People v. Adams* (1992), 149 Ill. 2d 331, 339, 597 N.E.2d 574.) A court "will not disturb an exercise of police power merely because there is room for a difference of opinion as to its wisdom or necessity." *Kalodimas v. Village of Morton Grove* (1983), 113 Ill. App. 3d 488, 493, 447 N.E.2d 849.

The large number of contagious diseases, the variety of ways they are contracted, treated, and prevented, the differences in their severity, the fluctuations in levels at which each disease is present,

and the limited amount of resources available to contain and treat all of these diseases are all factors which necessitate that the State Department of Public Health be allowed latitude and discretion in the manner in which it fulfills its duties to the public. See, *e.g.*, *Robertson*, 302 Ill. at 431 (discretionary power to designate a disease as contagious and authority to take steps to suppress it are required because the legislature cannot anticipate what diseases will break out); *New York State Society of Surgeons v. Axelrod* (1991), 77 N.Y.2d 677, 684, 572 N.E.2d 605, 608, 569 N.Y.S.2d 922, 925 (protection of the public health calls for "flexibility and the adaptation of the legislative policy to infinitely variable conditions)." See also *Adams*, 149 Ill. 2d at 339 (broad discretion traditionally given where measures are designed to protect and promote public health).

The language of section 2 is fully consistent with this approach and it appears on its face to grant broad discretion to the State Department of Public Health. Section 2 states that the State Department of Health "shall investigate the causes of dangerously contagious or infectious diseases, especially when existing in epidemic form, and take measures to restrict and suppress the same." (20 ILCS 2305/2 (West 1992).) Although use of the word "shall" is generally considered as imposing a mandatory duty (see *Greer*, 122 Ill. 2d at 148), the language of section 2 does not mandate particular actions by the Department to accomplish this duty. Permissive language is used throughout. For example, the Department "*may* declare and enforce quarantine," "*may* modify or relax quarantine," "*may* adopt, promulgate, repeal and amend rules and regulations and make such sanitary investigations and inspections *as it may from time to time deem necessary*," and, if a disease threatens to become epidemic and local authorities do not enforce efficient measures to restrict or suppress it, "*may* enforce such measures *as it deems necessary*." (Emphasis added.) 20 ILCS 2305/2 (West 1992).

■ Thus, in considering the language of the statute as a whole, we conclude that the manner in which the Department investigates and the specific measures it takes to suppress dangerously contagious diseases is left to the broad discretion of the Department. See *Hightower v. Duffy* (1989), 192 Ill. App. 3d 65, 74-75, 548 N.E.2d 495 (although Public Aid Code (Ill. Rev. Stat. 1987, ch. 23, par. 12—4) stated that grants "shall be adjusted," language of the statute when considered as a whole was directory rather than mandatory).

Where broad discretion is given to an agency, it negates the implication that there was legislative intent to create a private right of action. The case of *Suter v. Artist M.* (1992), 503 U.S. 347, 118 L. Ed. 2d 1, 112 S. Ct. 1360, is on point. In *Suter*, a class action suit was

filed under the Adoption Assistance and Child Welfare Act (42 U.S.C. §§ 670 through 679a (1980)), for declaratory and injunctive relief against the Illinois Department of Children and Family Services. The Federal statute required that, in order to receive Federal reimbursement for certain foster care expenses, a State must submit a plan for approval, which plan must include "reasonable efforts" to prevent or eliminate the need for removing a child from his or her home and to make it possible for the child to return home. (*Suter*, 503 U.S. at 351, 118 L. Ed. 2d at 9, 112 S. Ct. at 1364.) The United States Supreme Court noted that the "reasonable efforts" directive would require different actions in each individual case and that the manner in which the directive could be met was left to the discretion of the State. (*Suter*, 503 U.S. at 359-60, 118 L. Ed. 2d at 14, 112 S. Ct. at 1368.) The Court also noted a provision in the statute whereby the Secretary of Health and Human Services could reduce or eliminate reimbursement upon finding the "reasonable efforts" directive had not been met. (*Suter*, 503 U.S. at 360, 118 L. Ed. 2d at 14, 112 S. Ct. at 1368.) The Court concluded that no private right of action could be implied.

Just as in *Suter*, the actions required to effectively restrain and suppress contagious disease will vary depending upon the nature of each particular disease involved and the efficacy of various detection and treatment measures. (See *New York State Society of Surgeons*, 77 N.Y.2d at 684, 572 N.E.2d at 608, 569 N.Y.S.2d at 925 (because the same isolation, quarantine, reporting, testing, and contact tracing procedures are not appropriate to suppressing all communicable diseases, flexibility and adaptation to infinitely variable conditions is required).) It is common knowledge that the governmental resources available at any particular time are finite, and the allocation of those resources among the various diseases will depend upon variables such as the severity of each disease, the extent of the disease among the population, and the likelihood that the disease will spread.

As defendants argued below, to allow plaintiffs a private right of action could subject the Department of Public Health and local health authorities to inconsistent court rulings based on suits brought by a variety of groups, each of which proposes its own plan directed at a different contagious disease. Also, the plan which plaintiffs seek to have the court impose would place day-to-day administration of the State's public health policy in the courts rather than in the State Department of Public Health, where the General Assembly intended such authority to reside. (See, *e.g.*, *People v. Roush* (1984), 101 Ill. 2d 355, 365, 462 N.E.2d 468 ("Courts are particularly reluctant to get involved in the day-to-day administration of prisons [citation] because

such decisions can best be made by administrators vested with such authority, rather than judges").) This would undermine the Department's discretionary authority to allocate the State's limited resources for detection and treatment according to the best interests of the public as a whole. Furthermore, implication of a private right of action could also delay implementation of necessary measures while litigation is in progress. Thus, an implied private right of action is inconsistent with the legislature's purpose to establish a regulatory scheme under the direction of the Department of Public Health and its ultimate function of protecting the public from the spread of disease in epidemic form.

As to the City and County defendants, we note that section 2 of the DPHA imposes on them what appears to be a mandatory duty, stating that local health authorities "shall enforce the rules and regulations" adopted by the State Department of Public Health. However, as previously noted, the statute also provides that the State Department of Public Health may take whatever action it deems necessary to enforce its rules and regulations, at the expense of the locality. To provide a private right of action against the City defendants and the County defendants would undermine this discretionary authority of the Department of Public Health to determine what enforcement is warranted and would be inconsistent with the legislature's intent to establish a regulatory scheme directed by the Department.

We also note that the complaint in the present case, while proposing measures which may differ from those employed by the defendants, does not allege arbitrary or capricious actions. Therefore, even if a private right of action could otherwise have been implied under section 2 of the DPHA where defendants' actions are arbitrary and capricious, the availability of a private right of action would not have been sufficiently pled in this case. See *Robertson*, 302 Ill. at 427 (referring to public health quarantine measures, except where the regulations adopted are arbitrary, oppressive, and unreasonable, "[t]he court has nothing to do with the wisdom or expediency of the measures adopted"); *People ex rel. Otto v. Keeney* (1948), 399 Ill. 611, 614, 178 N.E.2d 252 ("court could not substitute its discretion for that of the Attorney General, where there was no arbitrary or capricious use of his power"); see also *Roush*, 101 Ill. 2d at 365.

■ The last requirement for implication of a private right of action is that such an action must be necessary to effectuate the purposes of the statute, or to provide an adequate remedy for violation of the statute. In this regard we note that the Act contains provisions which can supply teeth for enforcement, particularly

where the local public health authorities are concerned, albeit those teeth are not those of a saber-toothed tiger. As mentioned above, section 2 provides that whenever a dangerously contagious or infectious disease exists in epidemic proportion or threatens to become epidemic and local authorities neglect or refuse to enforce measures for restricting and suppressing the disease with sufficient efficiency and promptness, the Department of Public Health, at the expense of the locality, may enforce measures which it deems necessary for the locality. (20 ILCS 2305/2 (West 1992).) Furthermore, section 8.1 of the Act provides that any violation of a Department of Health rule or regulation constitutes a Class A misdemeanor (20 ILCS 2305/8.1 (West 1992)), which can result in a term of imprisonment of less than one year. (730 ILCS 5/5—8—3 (West 1992).) The statute requires the Department of Public Health and the State's Attorney for each county to institute such prosecutions.

While the existence of a remedy such as criminal prosecution does not preclude an implied private right of action (*Kelsay v. Motorola, Inc.* (1979), 74 Ill. 2d 172, 185, 384 N.E.2d 353), cases which have found a private right of action to be necessary involved situations where the penalties for violation were so minor that they provided no incentive for compliance. (See, *e.g.*, *Kelsay*, 74 Ill. 2d at 185 (imposition of small fine payable to the State insufficient to deter employers from discharging employees who file Workmen's Compensation Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.1 *et seq.*) claims).) Where the remedies enumerated in a statute itself are likely to be sufficient incentive for compliance, an implied private right of action is not necessary to effectuate the statute's purpose. For example, see *Parra v. Tarasco, Inc.* (1992), 230 Ill. App. 3d 819, 595 N.E.2d 1186. There, a $500 criminal penalty contained in the Choke-Saving Methods Act (Ill. Rev. Stat. 1989, ch. 56$^1$/2, par. 601 *et seq.*) made a private right of action under the statute unnecessary because it was unlikely that a restaurant proprietor would rather pay the $500 penalty than comply with the statute's requirement that Heimlich maneuver instructions be posted. (*Parra*, 230 Ill. App. 3d at 826.) Thus, although not essential to our decision because of the failure to meet the first and third prerequisites, we note that the penalties built into the statutory scheme would suffice to obviate the need for an implied private right of action as an additional incentive for enforcement.

In addition, we note that the DPHA is not remedial in nature. The analysis in *Davis v. Dunne* (1989), 189 Ill. App. 3d 739, 545 N.E.2d 539, is cogent and on point. There, the court stated that in determining whether a private right of action should be implied, it is proper

to ask whether the statute is remedial, *i.e.*, does the statute seek to redress wrongs against individuals who are harmed because the statute is violated. (*Davis*, 189 Ill. App. 3d at 743; see also *Rhodes v. Mill Race Inn, Inc.* (1984), 126 Ill. App. 3d 1024, 1027, 467 N.E.2d 915.) In *Davis*, a county civil service employee claimed that another employee received a promotion which the plaintiff would have received but for the hiring agency's violation of a rule promulgated under the authority of the Civil Service Act (Ill. Rev. Stat. 1987, ch. 34, par. 905 *et seq.*). The plaintiff asked the court to declare the other employee's promotion void and to order the plaintiff appointed to the position. (*Davis*, 189 Ill. App. 3d at 741.) The court noted that the purpose of the statute was to prescribe procedures for the appointment, promotion and removal of civil service employees in order to ensure competent civil service for governmental bodies. (*Davis*, 189 Ill. App. 3d at 743.) The purpose was not to redress wrongs against individual employees. In finding that the Civil Service Act did not support a private right of action, the court wrote, "Although the Act protects, in its observance, civil service employees such as Davis, it does not, in its breach, provide a civil remedy for those employees." *Davis*, 189 Ill. App. 3d at 743.

The same rationale should be applied in the present case. Here, as in *Davis*, the legislature sought, not to redress wrongs committed against individuals by the State Department of Public Health or the local health authorities, but to protect the public from contagious diseases, especially those existing in epidemic form, and to establish a regulatory scheme for that purpose.

■ We further note that, even if a private right of action could have been implied under the Act, suit against the State defendants would have to have been brought in the Court of Claims rather than the circuit court. The Court of Claims Act gives the Court of Claims exclusive jurisdiction to hear and determine claims against the State which are founded upon a State law or a regulation by an executive or administrative officer or agency pursuant to a State law. (See 705 ILCS 505/8(a) (West 1992).) While it is true that where a plaintiff is not seeking to enforce a claim for damages against the State, an action to enjoin a State officer from taking future actions in excess of his delegated authority can be brought in the circuit court (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 548, 370 N.E.2d 223), where an injunction could control the lawful operations of the State, jurisdiction is exclusively with the Court of Claims. See *Betts v. Department of Revenue* (1979), 78 Ill. App. 3d 102, 106, 396 N.E.2d 1150 (injunction would curtail both legal and illegal prosecutions and investigations by State agencies); *Hudgens v. Dean*

(1979), 75 Ill. 2d 353, 357, 388 N.E.2d 1242 (injunction would require State's affirmative act of rebuilding road); *G.H. Sternberg & Co. v. Bond* (1975), 30 Ill. App. 3d 874, 877, 333 N.E.2d 261 (injunction would prohibit actions by successor director who performed no wrongful acts).

Manifestly, the plan proposed by plaintiffs for approval and monitoring by the court would operate to control lawful actions of the State by requiring screening at certain locations, provision of caseworkers for certain tasks, provision of housing in some instances, and implementation of systems for identification and tracking. Therefore, as to the State defendants, if a private right of action existed, the Court of Claims would have had exclusive jurisdiction to grant the injunctive relief requested.

Finally, with respect to the County defendants, we must consider whether count II of the complaint was properly dismissed. As explained earlier, count II seeks declaratory and injunctive relief against the County defendants (the County of Cook and the "Cook County Board of Commissioners as the Cook County Board of Health") for alleged violations of section 5—25013(A)(7) of the Counties Code (55 ILCS 5/5—25013(A)(7) (West 1992)), which requires a county board of health, within its jurisdiction and its professional and technical competence, to investigate and adopt measures to prevent the spread of contagious or infectious diseases. The alleged violations, as in count I, concern the County defendants' actions or inactions in response to the alleged TB epidemic in Chicago only. Count II seeks injunction against the County defendants only in connection with the conduct of the County defendants inside the City of Chicago.

Defendants claim no private right of action can be brought under this section of the Counties Code because, under the Code, the County Board of Health has no jurisdiction in Chicago. Thus, they argue that there can be no violation of section 5—25013(A)(7) for failure to act within Chicago. They further argue that, because the statute only requires action within the County Board of Health's jurisdiction, plaintiffs are not within the class of persons for whose benefit the statute was enacted.

Section 5—25008 of the Counties Code (55 ILCS 5/5—25008 (West 1992)) specifically exempts any city, village or incorporated town with a population of 500,000 or more from the county health department's jurisdiction. A county board of health is the body which manages a county health department. (See 55 ILCS 5/5—25012 (West 1992).) Plaintiffs concede that, since Chicago has more than 500,000 inhabitants, the Cook County Board of Health has no jurisdiction to

act under section 5—25013(A)(7) within the City of Chicago. Plaintiffs argue, however, that the County defendants do, in fact, have jurisdiction over Cook County Hospital and Cermak Health Services, both located in Chicago. See 55 ILCS 5/5—37001 (West 1992) (giving the Cook County Board of Commissioners jurisdiction over Cook County Hospital and Cermak Health Services).

■ We note, first of all, that section 5—25013 expressly states that it applies only to actions by county and multicounty boards of health. Therefore, its provisions do not apply to defendant County of Cook, incorrectly sued as the Bureau of Health Services, since the Bureau of Health Services is not a county board of health. The section does apply, however, to the other county defendant, the Cook County Board of Commissioners as the Cook County Board of Health.

It is important to keep in mind, however, that section 5—25013 imposes upon boards of health governmental responsibilities regarding public health measures. Because section 5—25008 of the Counties Code puts the City of Chicago outside the jurisdiction of the Cook County Board of Health, section 5—25013 can impose upon the Cook County Board of Health none of those governmental public health duties. Any duties which arise regarding the operation of Cook County Hospital and Cermak Health Services arise, not from the public health provisions of section 5—25013, but from independent sources. For example, the duty to maintain Cook County Hospital and provide appropriate care therein derives from Counties Code section 5—37001 *et seq.*, entitled "County Hospitals—Counties Over 1,000,000 Population." (See 55 ILCS 5/5—37001 *et seq.* (West 1992).) Cook County Hospital also has the same duty of care that any medical provider has to its patients. (See *County of Cook*, 229 Ill. App. 3d at 177.) Section 3—15003 of the Counties Code, creating the Department of Corrections, is the source of the duty to maintain Cook County jail (see 55 ILCS 5/3—15003 (West 1992)), and the minimum standards for medical and health services to inmates are set forth in the Illinois Administrative Code (20 Ill. Adm. Code ch. I, § 701.90 (1988)). Thus, any duties owed by the County defendants to patients at Cook County Hospital or at Cermak Health Services, which provides care to Cook County jail inmates, arise from sources other than the public health statute under which plaintiffs claims a private right of action in count II.

As to plaintiffs' contention that section 5—25013(A)(7) indirectly imposes a duty on the County defendants to take actions within Chicago because conditions in Chicago threaten an epidemic of TB in Cook County, we note that the relief sought under count II is a study and court approved plan for restricting and suppressing TB in Chicago. Section 5—25013(A)(7) specifically requires a county board

of health to investigate and adopt measures within its jurisdiction for preventing the spread of contagious diseases. Since the Counties Code exempts Chicago from the County Board of Health's jurisdiction (55 ILCS 5/5—25008 (West 1992)), and section 5—25013(A)(7) applies only within that board's jurisdiction, that section can impose no duty on the County defendants to take any actions within Chicago to suppress TB.

Therefore, count II of plaintiffs' complaint was properly dismissed because it fails to state a claim on which relief can be based. Because the Counties Code places Chicago outside the Cook County Board of Health's jurisdiction, plaintiffs cannot assert any claim based on the actions or inactions of the Cook County Board of Health within the City of Chicago. By the same token, plaintiffs, suing on the basis of their residence, employment, or volunteer status in Chicago, cannot claim to be members of the class for whose benefit that statute was enacted. Having so concluded, we need not consider whether section 5—25013(A)(7) satisfies the four prerequisites for an implied private right of action (see *Rodgers*, 149 Ill. 2d at 308; *Corgan*, 143 Ill. 2d at 312-13 (discussed above)), although it would seem that the same infirmities found with respect to these prerequisites under section 2 of the DPHA are also present with respect to section 5—25013(A)(7) of the Counties Code.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY and COUSINS, JJ., concur.